**UNITED STATES of America, Plaintiff,**

v.

**Deric FRANK, Defendant.**

**No. 97 CR. 269 (DLC).**

United States District Court,
S.D. New York.

May 6, 1998.

---

254

256

Mary Jo White, United States Attorney, Southern District of New York, New York City, John Hillebrecht, Kerry Lawrence, Assistant United States Attorneys, for Plaintiff.

Leonard Joy, Jonathan Bach, Legal Aid Society, Federal Defender Division, New York City, Kevin McNally, McNally & Robinson, Frankfort, KY, for Defendant.

COTE, District Judge.

This is a capital case. The Grand Jury charges that, in early March 1997, the defendant, Deric Frank ("Frank"), kidnapped his girlfriend, Shaneika Price ("Price"), transported her across state lines, and murdered

her by setting fire to a car after he had locked her in the trunk.[1] The Government filed a Notice of Intent to Seek the Death Penalty on November 26, 1997, pursuant to 18 U.S.C. § 3593(a), part of the Federal Death Penalty Act of 1994 (the "FDPA" or "the Act"), codified at 18 U.S.C. § 3591 *et seq.* Frank has pled not guilty. Trial is set for June 1998.

To provide some context for this Opinion, the Court sets forth the following brief facts about the case. According to the Government, Frank is a drug dealer in Norwalk, Connecticut. He and Price had a volatile relationship spanning many years. At the time of her death, Price had a five year old son whom she claimed was fathered by Frank, and whom Frank had, at times, recognized as his son. Price had obtained an order of protection against Frank just three weeks prior to her death. Based on these and other facts, the Government has a twofold theory for Price's murder: (1) Frank believed that Price was cooperating with police and was going to tell them where he kept his stash of drugs; and (2) Frank's history of violence towards Price finally escalated into murder.

Frank is eligible for the death penalty on the kidnapping charge. His is the first death penalty prosecution in the Second Circuit under the FDPA.

At this juncture, Frank has filed numerous motions addressed to (1) the facial constitutionality of the FDPA; (2) the constitutionali-ty of the Government's use of certain statutory and non-statutory aggravating factors, as applied to him; (3) the propriety of putting off proof of a murder until the penalty phase; (4) the constitutionality of the Violence Against Women Act ("VAWA"), under which Frank is in part charged; (5) the propriety of the Government's decision to seek the death penalty in this case; and (6) the admissibility of certain evidence the Government intends to offer. This Opinion will address the first five categories of Frank's challenges. A separate Opinion will address his motions addressed to the evidence in this case.[2]

## I. BACKGROUND

Since 1994, the federal kidnapping statute has authorized the death penalty for individuals convicted of a kidnapping in which a death results. It provides, in pertinent part:

> Whoever unlawfully seizes ... kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person ... when the person is willfully transported in interstate or foreign commerce ... *if the death of any person results, shall be punished by death* or life imprisonment.

18 U.S.C. § 1201(a) (emphasis added). The kidnapping statute does not, however, set forth procedures for the imposition of a sentence of death. These procedures are set forth in the FDPA, which effectively reinstated the death penalty for numerous crimes as to which it had formerly been authorized, and for the first time authorized the death

---

**1.** The original Indictment in this case, filed on March 26, 1997, charged Frank with the following five counts: (1) conspiracy to commit interstate domestic violence and kidnapping, in violation of 18 U.S.C. § 371; (2) crossing state lines to commit domestic violence, in violation of 18 U.S.C. § 2261(a)(1); (3) causing an intimate partner to cross state lines to commit domestic violence, in violation of 18 U.S.C. § 2262(a)(2); (4) a second count of crossing state lines to commit domestic violence, in violation of 18 U.S.C. § 2261(a)(1); and (5) kidnapping, in violation of 18 U.S.C. § 1201(a)(1), 2.

A superseding Indictment, filed on February 25, 1998, made changes only to Count V. Whereas the original Indictment did not set forth a reason for the kidnapping, the superseding Indictment alleged that the defendant undertook the kidnapping "for ransom and reward and otherwise." It also alleged that the defendant abducted the victim "for the purpose of assaulting her, killing her, and for other purposes" and that, during the kidnapping,

> death resulted when [the victim] was burned to death while locked in the trunk of an automobile on an exit ramp of the Cross-Bronx Expressway in the Washington Heights section of New York, New York.

These changes to the Indictment were made in response to motions by the defendant challenging the sufficiency of the allegations in Count Five.

**2.** Frank also originally filed a motion to sever Count V of the Indictment, charging him with kidnapping, from the other counts. Because that motion was addressed largely to deficiencies in the Indictment as it was originally drafted—deficiencies that have been cured by the Superseding Indictment—the Court will not address the severance motion.

penalty for many other crimes, such as kidnapping.[3] Prior to the enactment of the FDPA, the death penalty could not be imposed even where it previously had been approved because Congress had not established procedures for its imposition that were consistent with the Supreme Court's death penalty jurisprudence. The FDPA filled this gap. *See* H.R.Rep. No. 103–467 (1994) (purpose of the FDPA is to "establish constitutional procedures for the imposition of the death penalty").[4]

The FDPA sets forth the following structure for the imposition of a sentence of death. First, if the Government intends to seek the death penalty for a certain defendant, it must notify him in advance of its intention to do so, and the basis for its view that death is authorized. *See* 18 U.S.C. § 3593(a)(1). The Government also must notify the defendant of all aggravating factors that the Government "proposes to prove as justifying a sentence of death" if the defendant is convicted of the underlying offense. *Id.* at 3593(a)(2).

The Act provides separate guilt and penalty phases for a death penalty prosecution. If the defendant is convicted at the guilt phase, the same jury returns to deliberate during the penalty phase. The penalty phase is an adversarial proceeding—in effect, a second trial—overseen by the court, and focused solely on the issue of whether the defendant should be put to death. During this phase, the Government must first set forth proof that the defendant had at least one of four enumerated mental states establishing the defendant's intent to kill. *Id.* at 3591(2).[5] The jury must find beyond a reasonable doubt that the defendant had at least one of these four mental states before it may consider a sentence of death.

If the jury finds that the defendant acted with at least one of the requisite mental states, then it may consider the Government's proof of any aggravating factors—the same factors of which the Government has previously given the defendant notice—that the Government believes weigh in favor of a death sentence ("the aggravating factors"). These factors may include factors set forth in the FDPA itself ("the statutory factors"),[6] and factors not set forth in the statute ("the non-statutory factors"). *Id.* at 3592(c). The defendant may put before the jury proof of any mitigating factors he believes weigh against a sentence of death. *Id.* at 3592(a). To return a death sentence, the jury must

---

3. *See* Pub.L. No. 103–322, § 60003–60024, *reprinted in* 1994 U.C.C.A.N. (108 Stat.) 1968–1982 (authorizing the death penalty for murders associated with crimes including kidnapping, bank robbery, hostage taking, murder for hire, genocide, carjacking, civil rights murders, drive-by shootings, sexual exploitation of children, murders of witnesses in federal investigations, murders of state correctional officers, and murders involving weapons of mass destruction).

4. Before the FDPA was enacted, new procedures for the imposition of the death penalty had been prescribed for the crime of air piracy where death resulted. New procedures, designed to be consistent with the Court's death penalty jurisprudence, also were enacted for drug-related murders through the Anti–Drug Abuse Act of 1988 (also known as the "Drug Kingpin Act"), codified at 21 U.S.C. § 848e *et seq.* *See* H.R.Rep. No. 103–467. The sentencing provisions of the FDPA are substantially similar to the sentencing provisions of the Anti–Drug Abuse Act of 1988.

5. The Act provides that a sentence of death may not be considered unless it is determined beyond a reasonable doubt at the penalty phase that the defendant

(A) intentionally killed the victim;
(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

18 U.S.C. § 3591(a).

6. The FDPA lists 16 statutory aggravating factors for homicide. These include, among others: the homicide occurred during the commission of another crime; the defendant had previously been convicted of a serious offense; the crime posed a grave risk to additional persons; the crime was committed in a heinous, cruel, or depraved manner; the crime was committed for pecuniary gain; and the crime involved substantial planning and premeditation. *See* 18 U.S.C. § 3592(c).

find the existence of at least one statutory aggravating factor. *Id.* at 3593(e). Having found the existence of at least one statutory aggravating factor, the jury then may consider *all* of the aggravating factors and *all* of the mitigating factors that have been proven. *Id.* The Government has the burden of establishing the existence of any aggravating factors beyond a reasonable doubt. The defendant's burden of establishing the existence of any mitigating factor is by a preponderance of the information. *Id.* at § 3593(c). The jury must weigh all of the aggravating factors it has found to exist against all of the mitigating factors that have been found to exist, and determine by unanimous vote whether the defendant should be sentenced to death or some lesser sentence. *Id.* at § 3593(e).[7]

The Act thus provides at least three hurdles that the Government must clear before it may ask a jury to impose a sentence of death. First, the Government must prove beyond a reasonable doubt that the defendant is guilty of a crime for which the death penalty is authorized. Second, it must prove beyond a reasonable doubt that the defendant acted with one of the four mental states

set forth in the statute. Third, it must prove beyond a reasonable doubt the existence of at least one statutory aggravating factor. If the Government does not carry its burden as to any of these hurdles, the jury may not consider a sentence of death. If the Government does carry its burden as to all three hurdles, the jury may, but need not, impose a sentence of death.

Here, the Government has notified the defendant that it intends to seek the death penalty for the kidnapping count. The Government indicated in its Notice of Intent to Seek the Death Penalty that it believes that the defendant possessed all four of the mental states set forth in the FDPA,[8] and that the circumstances of the crime suggest the existence of three statutory aggravating factors: (1) the death occurred during the course of another crime (kidnapping); (2) the offense was committed in an especially heinous, cruel, or depraved manner; and (3) the defendant committed the offense after substantial planning and premeditation to cause the death of a person.[9] Finally, the Government has identified four non-statutory aggravating factors that it contends weigh in favor

7. The jury is instructed to:
consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote ... shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.
18 U.S.C. § 3593(e).

8. The Government contends that the following descriptions of Frank's mental state establish his eligibility for the death penalty:
1. The defendant intentionally killed the victim. 18 U.S.C. § 3591(a)(2)(A).
2. The defendant intentionally inflicted serious bodily injury that resulted in the death of the victim. 18 U.S.C. § 3591(a)(2)(B).
3. The defendant intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act. 18 U.S.C. § 3591(a)(2)(C).

4. The defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act. 18 U.S.C. § 3591(a)(2)(D).

9. The corresponding statutory aggravating factors on which the Government intends to rely as justifying a death sentence are, stated in full, as follows:
1. The death, or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of, an offense under 18 U.S.C. Section 1201, which prohibits kidnapping. 18 U.S.C. § 3592(c)(1).
2. The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim. 18 U.S.C. § 3592(c)(6).
3. The defendant committed the offense after substantial planning and premeditation to cause the death of a person. 18 U.S.C. § 3592(c)(9).

of a death sentence: [10] (1) the victim was killed in an effort to obstruct justice; (2) the defendant presents a continuing danger to society; (3) the defendant caused severe and irreparable harm to the family of the victim; and (4) the defendant kidnapped and caused the death of his victim in violation of a judicial order of protection.[11]

The Court will address at the outset Frank's three challenges to the FDPA, first with respect to the Act's statutory framework; second concerning the particular statutory and non-statutory aggravating factors that have been noticed in this case; and third regarding the necessity of proving murder only at the penalty phase of trial. As a fourth issue, the Court will address Frank's challenges to the Violence Against Women Act. Fifth and last, the Court will address the propriety of the Government's decision to seek the death penalty in the first instance.

## II. DISCUSSION

### A. The Facial Constitutionality of the FDPA

Frank makes six challenges to the facial constitutionality of the FDPA, the most significant (and first three) of which attack the use of non-statutory aggravating factors at the penalty phase.[12] First, Frank claims that the Act's incorporation of non-statutory factors violates principles of the Supreme Court's death penalty jurisprudence because the use of non-statutory factors encourages wholly arbitrary and capricious death sen-

tences. Second, he claims that the statute's authorization of the United States Attorney to define non-statutory aggravating factors constitutes an impermissible delegation of power in violation of the separation of powers doctrine. Third, and related to the second claim, Frank argues that the use of non-statutory aggravating factors violates the Ex Post Facto Clause of the Constitution. Frank's additional challenges to the facial validity of the FDPA are, fourth, that the evidentiary standard prescribed for the penalty phase of the trial is insufficiently rigorous; fifth, that the Act provides inadequate appellate and proportionality review; and sixth, that the death penalty is per se unconstitutional under the Eighth Amendment.

The Court notes at the outset that all of the arguments advanced by Frank for the FDPA's facial unconstitutionality have been rejected by other courts confronted with death penalty prosecutions under the Act. A growing body of case law, derived largely from district court opinions and a few circuit opinions, has developed considering various challenges to the FDPA and its precursor, the Anti–Drug Abuse Act of 1988. Without exception, these opinions have upheld both Acts' constitutionality. See, e.g., United States v. Jones, 132 F.3d 232 (5th Cir.1998) (considering similar challenges to the FDPA); United States v. Tipton, 90 F.3d 861 (4th Cir.1996) (considering similar challenges to the Anti–Drug Abuse Act), cert. denied, —— U.S. ——, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997); United States v. McCul-

---

**10.** The Government initially listed as an additional non-statutory aggravating factor that the defendant lacks remorse for the offense that he committed. In its memorandum of law in opposition to the defendant's pre-trial motions, filed on February 17, 1998, the Government announced its intention to retract the absence of remorse factor in a superseding Notice of Intent to Seek the Death Penalty. The Court awaits the filing of the new Notice of Intent letter but, for the purposes of this Opinion, will assume that this factor has been rescinded.

**11.** The non-statutory aggravating factors of which the Government has given notice, and upon which it continues to rely, are in full:

1. The victim was killed in an effort to obstruct justice, to tamper with a witness, and in retaliation for the victim's cooperating with

law-enforcement authorities, each as part of an effort by the defendant to protect his illegal narcotics distribution activities and in furtherance of those activities.
2. The defendant represents a continuing danger to the lives and safety of other persons.
3. The defendant caused severe and irreparable harm to the family of his victim.
4. The defendant kidnapped and caused the death of his victim in violation of a judicial order of protection.

**12.** The arguments addressed here are raised primarily in Frank's Memorandum of Law in Support of A Motion to Preclude Imposition of the Death Penalty and for Other Appropriate Relief. Some of the arguments are also alluded to in his Memorandum of Law in Support of Motion to Strike the Notice of Intent to Seek the Death Penalty.

lah, 76 F.3d 1087 (10th Cir.1996) (same), *cert. denied*, —— U.S. ——, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997); *United States v. Kaczynski*, 96 Civ. 259 (GEB), 1997 WL 716487 (E.D.Cal. Nov. 7, 1997) (considering challenges to the FDPA); *United States v. Nguyen*, 928 F.Supp. 1525 (D.Kan.1996) (same); *United States v. Davis*, 912 F.Supp. 938 (E.D.La.1996) (same), *aff'd*, 132 F.3d 1454 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1331, 140 L.Ed.2d 492 (1998); *United States v. McVeigh*, 944 F.Supp. 1478 (D.Col.1996) (same); *United States v. Pitera*, 795 F.Supp. 546 (E.D.N.Y.1992) (considering challenges to Anti–Drug Abuse Act). This Court has considered on its own the merits of Frank's arguments, but nevertheless concludes that it agrees with the other courts that have considered these issues. In sum, the Court does not find the FDPA constitutionally infirm for any of the reasons advanced by Frank.

### 1. The FDPA's Incorporation of Non–Statutory Aggravating Factors

First, the Court rejects the argument that the use of non-statutory aggravating factors will result in the arbitrary and capricious imposition of the death penalty. In order to evaluate this argument and the others that follow, a brief review of the Supreme Court's death penalty jurisprudence is necessary.

### a) *Furman* and *Gregg*

The landmark decisions in the Supreme Court's death penalty jurisprudence are *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Although the Court has often revisited the various aspects of the constitutional imposition of the death penalty,

> [s]ince 1976, the Supreme Court's pronouncements on capital punishment have been essentially backward-looking; majority and dissenting Justices alike have cast their positions in terms of what *Furman* and *Gregg* command and permit.

Carol and Jordan Steiker, *Sober Second Thoughts: Reflections of Two Decades of Constitutional Regulation of Capital Punishment*, 109 Harv.L.Rev. 355, 364 (1995).

In *Furman*, the Court struck down Georgia's capital sentencing scheme under the Eighth Amendment. Under the Georgia scheme, capital punishment was authorized for any defendant convicted of murder. Juries were given no guidance as to which subgroup of murderers, among that large group of defendants eligible for the death penalty, should be sentenced to death.

The majority opinion of the *Furman* Court is a one-paragraph per curiam opinion invalidating the imposition of the death penalty against the three petitioners in the case. Each of the five Justices in the majority appended a concurring opinion, however, explaining their own reasons for the decision. Only two Justices, Brennan and Marshall, wrote that the death penalty was *per se* unconstitutional as cruel and unusual punishment. Justice Stewart's opinion best expressed the theme that would become the core of the Court's jurisprudence in the years to follow. Emphasizing the infrequency and arbitrariness of the imposition of the death penalty in Georgia, Justice Stewart wrote:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people [eligible for the death penalty under Georgia's statute], many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed.... [I]f any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race.... [Putting aside the issue of race,] I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Furman*, 408 U.S. at 309–10, 92 S.Ct. 2726. Thus, according to Justice Stewart, the death penalty was not *per se* unconstitutional, but a statutory scheme that allowed juries to impose the death penalty "wantonly" and "freakishly," was inconsistent with the Eighth Amendment. To meet constitutional requirements, a statute would at the very

least have to give the jury a principled basis for determining which murderers should live and which should die, so that a sentence of death would not occur with the randomness of a stroke of lightning.

In his separate concurrence, Justice White also focused on the lack of guidance given to juries under the Georgia scheme, although he described the problem as one of over-delegation of sentencing authority to the jury. *Id.* at 314, 92 S.Ct. 2726. Justice White noted, "[l]egislative 'policy' is thus necessarily defined not by what is legislatively authorized but by what juries and judges do in exercising the discretion so regularly conferred upon them." *Id.*

Georgia revised its capital sentencing scheme in the aftermath of *Furman.* The new scheme, which the Court reviewed in *Gregg v. Georgia,* no longer gave the jury unbridled discretion to impose death on any defendant convicted of murder. Although the state murder statute continued to authorize the death penalty for anyone convicted of murder, the revised capital sentencing scheme established ten statutory aggravating circumstances, at least one of which had to be established beyond a reasonable doubt before a jury could consider imposing a death sentence. In addition, the scheme authorized the jury to consider "any other appropriate aggravating or mitigating circumstances." *Gregg,* 428 U.S. at 197, 96 S.Ct. 2909. Finally, the revised scheme provided for automatic appellate and proportionality review by the Georgia Supreme Court of any sentence of death. *Id.* at 198, 96 S.Ct. 2909. Proportionality review is an inquiry into "whether the sentence is disproportionate compared to those sentences imposed in similar cases." *Id.*

the *Gregg* Court upheld the revised scheme. Justice Stewart, writing for the Court, stated that the revised statute addressed the concerns raised in *Furman;* no longer would sentences of death be imposed "wantonly" or "freakishly." *Gregg,* 428 U.S. at 207, 96 S.Ct. 2909. The Court noted with respect to the effect of the new procedures:

No longer can a Georgia jury do as Furman's did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, *the jury's attention is directed to the specific circumstances of the crime:* Was it committed in the course of another capital felony? Was it committed for money? Was it committed upon a peace officer or judicial officer? Was it committed in a particularly heinous way or in a manner that endangered the lives of many persons? In addition, *the jury's attention is focused on the characteristics of the person who committed the crime:* Does he have a record of prior convictions for capital offenses? Are there any special facts about this defendant that mitigate against imposing capital punishment (*e.g.,* his youth, the extent of his cooperation with the police, his emotional state at the time of the crime). As a result, *while some jury discretion still exists, the discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory applications.*

*Id.* at 197–98, 96 S.Ct. 2909 (internal quotation omitted) (emphasis added). In short, because the new scheme provided the jury with clear and objective standards to guide their consideration of (1) the circumstances of the crime, and (2) the characteristics of the defendant, the scheme passed constitutional muster. *Id.* at 198, 96 S.Ct. 2909. The *Gregg* Court also noted favorably the mandatory appellate and proportionality review provisions that were part of the new scheme, calling them "additional" or "further" safeguards against "arbitrariness and caprice." *Id.*

During the same term in which it decided *Gregg,* the Supreme Court handed down four additional decisions elucidating its emerging view of the constitutional regulation of capital punishment. In *Roberts v. Louisiana,* 428 U.S. 325, 336, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), and *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), the Court struck down Louisiana and Texas statutes providing for the mandatory imposition of the death penalty in certain circumstances. Sounding what would emerge as the strongest counter-theme to *Gregg's* "clear and objective standards" theme, the Court noted in *Woodson* that

in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. 428 U.S. at 304, 96 S.Ct. 2978 (internal citation omitted). *Woodson* established that, no matter how clearly and objectively a capital sentencing scheme guided the jury's discretion as to aggravating factors, the scheme would not pass constitutional muster if it did not in addition permit the jury to consider mitigating evidence as a reason to impose a sentence less than death.

In *Jurek v. Texas*, 428 U.S. 262, 276–77, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and *Proffitt v. Florida*, 428 U.S. 242, 259–60, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Court upheld two additional state capital sentencing schemes which, like Georgia's, adequately guided the jury's discretion while allowing the jury to consider any mitigating circumstances. In these decisions, as in all five of the 1976 opinions, the Court emphasized the twin, competing themes of its emerging jurisprudence. On the one hand, the jury must be given clear and objective standards, regarding the circumstances of the crime and of the defendant, to distinguish between those defendants who should live and those who should die. On the other hand, the jury must be allowed to consider all mitigating evidence regarding the defendant, so that its decision is based on "all possible relevant information about the individual defendant whose fate it must determine." *Jurek*, 428 U.S. at 276. *See Torres v. United States*, 140 F.3d 392, 1998 WL 139069, at \*13 (2d Cir. 1998).

### b) Since *Furman* and *Gregg*

The Court's death penalty jurisprudence continues to speak in terms of the themes sounded in *Furman* and *Gregg*.[13] More recent cases, echoing *Gregg*, hold that a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). *See also McCleskey v. Kemp*, 481 U.S. 279, 303, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) ("a State must 'narrow the class of murderers subject to capital punishment'") (quoting *Gregg*, 428 U.S. at 196, 96 S.Ct. 2909).

The Supreme Court has clarified that the required narrowing function may be accomplished in either of two ways:

> The legislature may itself narrow the definition of capital offenses . . . so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

*Lowenfield v. Phelps*, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Thus, the aggravating circumstance that distinguishes the crime from all other murders and makes it worthy of the death penalty "may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). The narrowing doctrine in effect "force[s] communities, speaking through [their] legislatures, to designate in advance those offenders most deserving of death." Steiker & Steiker, *supra*, at 372. Instead of leaving it to juries to determine which offenses are deserving of death, as had Georgia prior to *Furman*, states now must determine in advance—either through the definition of the crime itself or through the use of aggravating circumstances—which crimes are most deserving of capital punishment.

---

**13.** The Supreme Court made a significant addition to its death penalty jurisprudence in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), which imposed a floor on the types of criminal defendants that may be put to death consistent with the Eighth Amendment. The Court held in these cases that the death penalty may not be imposed on an individual who lacked a minimal level of homicidal intent, *Enmund*, 458 U.S. at 801, 102 S.Ct. 3368; *Tison*, 481 U.S. at 158, 107 S.Ct. 1676, or who did not take a human life, *Enmund*, 458 U.S. at 797, 102 S.Ct. 3368.

The Court has further clarified the requirements of any aggravating factor upon which a sentence of death is predicated:

First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder.... Second, the aggravating circumstance may not be unconstitutionally vague.

*Tuilaepa*, 512 U.S. at 972, 114 S.Ct. 2630 (internal quotation omitted). In short, the "distinction" offered by an aggravating factor must be meaningful. "If the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the [factor] is constitutionally infirm." *Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993) (emphasis in original). Finally, to satisfy vagueness review, the aggravating factor must "have some common-sense core of meaning ... that criminal juries [are] capable of understanding." *Tuilaepa*, 512 U.S. at 975, 114 S.Ct. 2630 (ellipsis in original) (internal citation omitted).

### c) The FDPA

■ Frank argues that the FDPA does not comport with constitutional requirements. First, he claims that the Act will result in the "wanton" and "freakish" imposition of the death penalty, as barred by *Furman*, because the non-statutory factors identified by the Government will be different in every case. Frank argues that allowing the government to introduce non-statutory factors unique to each case

injects into capital proceedings precisely the uncertainty and disparate results that *Furman* found to violate the Eighth Amendment. The only guidance that the statute gives is really no guidance at all: that the prosecutor may give notice of, and the jury may consider, "any other aggravating factor." Beyond the requirement that a factor be "other" and be "aggravating," the statute provides no guidance to prosecutors in determining how to select or define non-statutory aggravating factors in a particular case. Under such a scheme, the factors on which the sentencer must base its decision are not limited to "clear and objective" criteria, *Gregg*, 428 U.S. at 198, 202, 96 S.Ct. 2909, but are restricted only by the imagination of the prosecutor. Particularly in conjunction with the evidentiary free-for-all created by the scope of "information" admissible at the penalty phase ..., the statute's standard-less procedure creates an impermissible risk that the death penalty will be imposed arbitrarily and capriciously, in violation of the Eighth Amendment.

The Court will address separately below that portion of Frank's argument concerning the evidentiary standard provided for the penalty phase. The Court therefore confines its analysis in this section to the Government's selection and use of non-statutory aggravating factors.

Frank does not argue that, when non-statutory aggravating factors are put aside, the FDPA fails adequately to narrow the class of defendants eligible for the death penalty. Instead, he argues that the fact that the Government may introduce non-statutory factors undoes all of the narrowing work otherwise accomplished by the statute. According to Frank, the introduction of non-statutory factors injects impermissible arbitrariness into the jury's decision because the Government is utterly unrestrained in its ability to identify non-statutory factors particular to the defendant.

This argument is unavailing for two reasons. First, the Government is restrained in its ability to choose aggravating factors by the Supreme Court's death penalty jurisprudence and the trial court's review of the factors. Second, the argument ignores the other dominant theme (discussed above) of the Supreme Court's death penalty jurisprudence—of no less importance than its "narrowing" holdings—that the decision to impose death must be particularized to an individual defendant. *See, e.g., Jurek*, 428 U.S. at 274, 96 S.Ct. 2950; *Gregg*, 428 U.S. at 204, 96 S.Ct. 2909. Because the decision to impose death must be individualized, the jury is required to consider the circumstances of the crime as well as the record and character of the defendant. *Tuilaepa*, 512 U.S. at 972, 114 S.Ct. 2630.

Although it is true that the FDPA provides that the Government may introduce any "other" aggravating factor for which it has given notice, the prosecutor does not enjoy unbridled discretion to choose aggravating factors. As the Fifth Circuit determined when it considered this issue,

> the death penalty jurisprudence devised by the Supreme Court guides the prosecution in formulating nonstatutory aggravating factors. For example, due process requires that information submitted as aggravating genuinely narrow the class of persons eligible for the death penalty.

*Jones,* 132 F.3d at 240 (citing *Zant,* 462 U.S. at 877, 103 S.Ct. 2733). *See also Zant,* 462 U.S. at 885, 103 S.Ct. 2733 (listing ways in which an aggravating circumstance may be invalid). The non-statutory aggravating factors identified by the Government also may not be unfairly duplicative of one another, *see Jones,* 132 F.3d at 250–51, or unconstitutionally vague, *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630.

In addition, the FDPA explicitly provides that a jury may not consider information regarding the defendant for the kind of impermissible purposes that were at the heart of the Court's concerns in *Furman.* The FDPA explicitly requires the court to instruct the jury that it may not take into account the defendant's race, color, national origin, religious beliefs, or sex in considering whether a sentence of death is justified. 18 U.S.C. § 3593(f). Indeed, to ensure that such characteristics do not play a role in the process, the jury is required to return to the court a certificate, signed by each juror, stating that these factors played no part in their decision. *Id.* It goes without saying, therefore, that the Government may not ask the jury to consider factors such as the defendant's race in reaching a decision as to whether the defendant should be put to death.

The FDPA ensures that the Government will not violate these constitutional and statutory rules in any particular prosecution by requiring that a defendant have notice of the factors on which the Government intends to rely, and by providing a gate-keeping role for the district court. Thus, the Government

may not employ simply any non-statutory factor of its choice. Instead, having chosen non-statutory factors it believes appropriate to the case, the Government must submit such factors to the defendant and to the court. If the court determines that any of the factors are inappropriate or run afoul of the Supreme Court's death penalty jurisprudence, the factor will be excluded. *See* 18 U.S.C. § 3593(c). *See also Jones,* 132 F.3d at 250–51 (excluding non-statutory factors as duplicative); *Nguyen,* 928 F.Supp. at 1543–44; *Davis,* 912 F.Supp. at 945–47 (excluding non-statutory factors as duplicative or otherwise improper).

Given this Court's finding that the Government's discretion to identify non-statutory aggravating factors is limited by constitutional norms and the district court's review, the Court now addresses why the use of such non-statutory factors—far from injecting arbitrariness into the process—is to be encouraged. *See Woodson,* 428 U.S. at 304, 96 S.Ct. 2978. The preference for allowing non-statutory factors in addition to all available mitigating evidence comes from the Supreme Court's view that "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek,* 428 U.S. at 276, 96 S.Ct. 2950 (1976). The FDPA's use of non-statutory aggravating factors borrows a structure employed in the very first death penalty statute upheld by the Court, which allowed the jury to consider "any other appropriate aggravating factor" after it had found one of the statutory aggravating factors to exist. *Gregg,* 428 U.S. at 197. Indeed, once the jury's discretion has been sufficiently guided in determining whether the defendant is eligible for the death penalty, the jury may be given *"unbridled discretion* in determining whether death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Tuilaepa,* 512 U.S. at 979–80, 114 S.Ct. 2630 (quoting *Zant,* 462 U.S. at 875, 103 S.Ct. 2733) (emphasis added).

In light of the foregoing, Frank's motion to preclude imposition of the death penalty on the ground that the use of non-statutory

factors injects impermissible arbitrariness into the jury's deliberations is denied.

### 2. The Non–Delegation Doctrine

 The defendant's challenge to the FDPA on the basis of the nondelegation doctrine must be rejected largely for the reasons set forth in the preceding analysis. The nondelegation doctrine arises from the constitutional principle of separation of powers, specifically Article 1, Section 1, which provides that "all legislative Powers herein granted shall be vested in a Congress of the United States." *See Touby v. United States,* 500 U.S. 160, 164–65, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (internal quotation omitted); *United States v. Mistretta,* 488 U.S. 361, 371, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Under the nondelegation doctrine, Congress may not constitutionally delegate its legislative power to another branch of government. *See Mistretta,* 488 U.S. at 372, 109 S.Ct. 647. Congress may seek assistance, however, from the other branches of government. So long as it formulates "an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Id.* (internal citation omitted) (brackets in original).

Here, Frank argues that the FDPA violates the nondelegation doctrine because it

affords prosecutors virtually limitless discretion to identify and define non-statutory aggravating factors, without any clear guidance as to how such discretion should be exercised.... The statute fails to identify any policy goals or general considerations that could serve to confine unchecked prosecutorial discretion in choosing such factors. Rather, Section 3592(c) invites the prosecution to rewrite the statute's list of factors to justify the imposition of a death sentence on a case-by-case basis.

This argument is unavailing because, as outlined above, the Court finds that the prosecution *is* limited in its ability to identify non-statutory aggravating factors by the Supreme Court's death penalty jurisprudence, the notice requirement, the district court's review, and the statute's requirement that any information including any aggravating factors be "relevant" to the sentencing decision. 18 U.S.C. § 3593(c). Thus, even if the authority to identify non-statutory aggravating factors constitutes a delegation of legislative power—an issue on which courts have disagreed, *see Davis,* 904 F.Supp. at 558–59 (collecting cases)—this Court finds that the statute, construed so as to be consistent with the Supreme Court's death penalty jurisprudence, provides sufficient guidance to satisfy the nondelegation doctrine.

The FDPA does not delegate to the prosecutor the authority to "rewrite the statute's list of factors to justify the imposition of a death sentence on a case-by-case basis." Instead, Congress, by determining which crimes will support a sentence of death, has made an initial determination of the class of defendants eligible for the death penalty that is further narrowed through the use of the mental states set forth at Section 3591. The class of death-eligibles is then further narrowed through the requirement that the jury find beyond a reasonable doubt the existence of at least one statutory aggravating factor.

As the Honorable Reena Raggi noted with respect to the Anti–Drug Abuse Act,

[i]n identifying and presenting non-statutory factors for the jury's consideration, the prosecution does not intrude upon the legislative prerogative either to define the capital crime or to narrow the class of persons eligible for the death penalty.... [T]hat constitutionally-mandated narrowing has been achieved by Congress in limiting the types of homicides for which the death penalty may be imposed and in requiring proof of certain statutory aggravating factors. The prosecution's role is limited to that phase of the proceeding wherein the jury makes an individualized sentencing determination as to the defendant on trial. In the course thereof the prosecution engages in advocacy, not legislation.

*Pitera,* 795 F.Supp. at 560. In identifying non-statutory aggravating factors weighing in favor of death once the statutory hurdles have been cleared, the prosecutor does not

rewrite the statute. Instead, the prosecutor performs a different function of putting before the sentencer "as much information ... as possible," *Gregg*, 428 U.S. at 204, 96 S.Ct. 2909, so that the sentencing decision can be individualized, *Woodson*, 428 U.S. at 304, 96 S.Ct. 2978. This function is in no material respect different from the function prosecutors normally perform in providing information to the court so that an imposed sentence is tailored to the circumstances of both the individual defendant and the crime. *See Mistretta*, 488 U.S. at 390, 109 S.Ct. 647 (noting that "the sentencing function long has been a peculiarly shared responsibility among the Branches of Government and has never been thought of as the exclusive constitutional province of any one Branch"). Congress customarily sets a maximum sentence for an offense, and occasionally a mandatory minimum sentence, and allows district courts discretion within those boundaries to fashion the appropriate sentence for the offender based on all relevant information. The Court therefore finds that whatever authority is delegated under the FDPA is appropriately guided and, in addition, does not differ in any material respect from the role generally delegated with respect to sentencing.

### 3. The Ex Post Facto Clause

Frank's challenge under the Ex Post Facto Clause also may be addressed summarily in light of the preceding discussion. Article 1, Section 9 of the United States Constitution provides that "No ... ex post facto Law shall be passed." The Ex Post Facto Clause is implicated by laws that retroactively alter the definition of crimes, increase the punishment for criminal acts, or deprive a defendant of a defense available at the time that the crime was committed. *See California Dep't of Corrections v. Morales*, 514 U.S. 499, 504, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995); *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925). The Supreme Court has held that procedural changes in a capital sentencing scheme that alter the method of determining whether the death penalty should be imposed do not implicate the Clause. *See Dobbert v. Florida*, 432 U.S. 282, 293–94, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

Here, there have been no changes to the FDPA, nor the substantive criminal statutes under which Frank is charged, between the time of the crime and the present, approximately one month before trial. Nevertheless, Frank argues that the FDPA violates the Ex Post Facto Clause because it

> impermissibly allows the prosecution to select aggravating factors, not listed in the statute, that are to be applied retroactively to crimes committed before the aggravating factors are identified.

As outlined above, the Court does not find that, in identifying non-statutory factors, the prosecution rewrites the elements of the crime. Similarly, the use of non-statutory factors does not increase the punishment for the crime. *See Poland v. Arizona*, 476 U.S. 147, 156, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) ("Aggravating circumstances are not separate penalties or offenses, but are standards to guide the making of [the] choice between the alternative verdicts of death and life imprisonment.") (internal quotation omitted) (alteration in original). Only if the jury determines that the requisite statutory aggravating factors are present is the defendant eligible for a sentence of death. The defendant is judged as guilty or not, and eligible for the punishment of death or not, on the basis of criteria set by Congress well before the commission of the offense. In individualizing the sentencing decision, the jury's attention is necessarily directed to facts that come into existence with the commission of the crime. This is an essential feature of all sentencing and does not violate the Ex Post Facto Clause.

### 4. The Evidentiary Standard for the Penalty Phase

Frank's next challenge to the FDPA concerns the evidentiary standard employed in the sentencing hearing. Section 3593, entitled "Special hearing to determine whether a sentence of death is justified," provides, in pertinent part:

> At the sentencing hearing, *information may be presented as to any matter relevant to the sentence*, including—any mitigating or aggravating factor permitted or required to be considered under Section

3592 [mitigating and aggravating factors].... The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been given under subsection (a). *Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.* The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death.

18 U.S.C. § 3593(c) (emphasis added). Frank contends that the adversarial proceeding described above constitutes an evidentiary "free-for-all" that does not adequately protect his rights, nor comport with the Supreme Court's decisions requiring a heightened reliability standard before a sentence of death may be imposed. *See Lowenfield,* 484 U.S. at 238–39, 108 S.Ct. 546 (the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed") (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). The Court disagrees.

Although Section 3593 expressly suspends the formal rules of evidence at the sentencing hearing, it does not suspend all sense of order. Explicit in the Section's recitation of what may be admitted—as is the case throughout the FDPA—is a role for the district court as gate-keeper, as well as the requirement that all information presented be relevant. Without naming it as such, Section 3593 also incorporates an analogue to Federal Rule of Evidence 403, which may be

considered the "super" rule of evidence in the federal system.[14] Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Rule 403, Fed.R.Evid. Rule 403 expresses the twin goals of any criminal proceeding: to allow in as much relevant information as would be helpful to the finder of fact, without prejudicing the rights of the defendant.

The most significant difference between the standard articulated in Rule 403 and Section 3593 is that the latter actually protects the rights of a defendant to a greater extent. Whereas Rule 403 provides that relevant evidence may be excluded if the judge determines that its probative value is "substantially outweighed" by the danger of unfair prejudice, Section 3593 provides that information should be excluded if its probative value is "outweighed"—with no qualification that it be outweighed "substantially"—by the danger of unfair prejudice.

This distinction is not inconsequential. *See Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 151 (2d Cir.1997) (under Rule 403, evidence should be excluded only where the imbalance between unfair prejudice and probative value is substantial); *United States v. Gelzer,* 50 F.3d 1133, 1139 (2d Cir.1995) (Rule 403 is concerned with prejudice involving some adverse effect beyond tending to prove the fact or issue that justified its admission into evidence). Other courts considering the evidentiary standard set forth at Section 3593 have concluded that it affords greater protection to a defendant than does Rule 403, and interjects sufficient reliability into the sentencing proceeding to meet constitutional standards. *See Nguyen,* 928 F.Supp. at 1546–47; *Davis,* 904 F.Supp. at 561; *Kaczynski,* 1997 WL 716487, at *8–*9.

Traditionally, the federal rules of evidence have not governed sentencings. *Williams v.*

---

**14.** In the 1972 Advisory Committee Notes to Rule 403, the Committee observed:

> [t]he rules which follow in this Article are concrete applications evolved for particular situations. However, they reflect the policies underlying the present rule, which is designed as a guide for the handling of situations for which no specific rules have been formulated.

*New York,* 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). Whereas the focus of a trial is singular: "whether a defendant is guilty of having engaged in criminal conduct of which he has been specifically accused," *id.* (quoted in *Pitera,* 795 F.Supp. at 564), "[a]n individualized consideration of sentence ... necessitates a broader inquiry into all aspects of the defendant's life and the crime committed," *Pitera,* 795 F.Supp. at 564–65. Accordingly, the Supreme Court has held that, when it comes to sentencing, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Payne v. Tennessee,* 501 U.S. 808, 821, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (internal quotations omitted).

This rule applies even to capital sentencings. *Id.* Indeed, in *Gregg,* the Supreme Court explicitly endorsed a different evidentiary standard at a capital sentencing hearing in light of the special nature of that proceeding. Responding to the defendant's objection to the "wide scope of evidence and argument allowed at presentence hearings," the *Gregg* Court wrote:

> We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

*Gregg,* 428 U.S. at 203–04, 96 S.Ct. 2909 (internal citations omitted).

That the federal rules of evidence are suspended during a capital sentencing hearing is particularly appropriate given the difference of death from all other penalties. *See Woodson,* 428 U.S. at 305, 96 S.Ct. 2978. As outlined above, the Supreme Court's death penalty jurisprudence emphasizes repeatedly the need to individualize the sentence of death and put before the jury as much information as possible about *this* defendant and

*this* crime. *See id.* at 304, 96 S.Ct. 2978; *Jurek,* 428 U.S. at 276, 96 S.Ct. 2950; *Gregg,* 428 U.S. at 204, 96 S.Ct. 2909. In sum, the Court's death penalty jurisprudence explicitly directs that the normal rules of evidence should not be applied at the penalty phase, but should be replaced by the *Gregg* standard—*i.e.,* "evidence [may be] introduced and ... arguments [may be] made ... [so long as they] do not prejudice a defendant." *Id.* at 204, 96 S.Ct. 2909. The evidentiary rule set forth in Section 3593 meets this standard.

In interpreting Section 3593, the Court reads the word "prejudice" to be a reference to unfair prejudice, since all information in support of aggravating factors will invariably prejudice the defendant. Section 3593 guards against the use of information that will unfairly prejudice the defendant, while allowing in all relevant information that would assist the jury in determining whether the individual defendant before them should be sentenced to death.

The cases cited by Frank do not suggest a contrary conclusion. Indeed, when understood in context, the call for "reliability" in capital sentencings that is found in many of these cases, *e.g., California v. Brown,* 479 U.S. 538, 543, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), is not a statement about particular evidentiary rules, but is instead a reminder that the Eighth Amendment requires "reliability in the determination that death is the appropriate punishment *in a specific case,*" *id.* (quoting *Woodson,* 428 U.S. at 305, 96 S.Ct. 2978) (emphasis added). Thus, the cases cited by Frank endorse instructions that "limit the jury's consideration to matters introduced in evidence before it," as opposed to "extraneous emotional factors, which ... would be far more likely to turn the jury against a capital defendant than for him." *Id.* 479 U.S. at 543, 107 S.Ct. 837.

In light of the foregoing, the Court finds that the FDPA adequately safeguards the rights of the defendant, while simultaneously ensuring that the jury has "before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek,* 428 U.S. at 276, 96 S.Ct. 2950. *See Jones,* 132 F.3d at 241–42 (concluding

that the FDPA's evidentiary standard meets constitutional requirements). The Court therefore denies Frank's motion to preclude imposition of the death penalty on the basis of the evidentiary standard embodied in Section 3593.

5. The Adequacy of Appellate and Proportionality Review

a) Appellate Review

 Frank's challenge to the adequacy of appellate review provided under the FDPA has two components. First, he argues that the statute is unconstitutional because it lacks mandatory appellate review. Second, he argues that the statute is unconstitutional because it limits the appellate court's review to three areas: "the presence of wholly arbitrary factors, evidentiary insufficiency, and properly preserved legal errors which require reversal of the sentence."

As to the first point, the Court finds that Frank has accurately characterized the statute,[15] but that the argument—to the extent that is has merit—is unavailable to him at this time. *See, e.g., Parker v. Dugger,* 498 U.S. 308, 321, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). In addition, every state capital sentencing scheme upheld by the Supreme Court appears to have provided mandatory appellate review. *See, e.g., Gregg,* 428 U.S. at 198, 96 S.Ct. 2909 (noting Georgia's provision for mandatory review); *Jurek,* 428 U.S. at 276, 96 S.Ct. 2950 (noting Texas's provision for "prompt judicial review"); Tex.Art. 37.071(h) (providing that "the judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals"); *Proffitt,* 428 U.S. at 250, 96 S.Ct. 2960 (noting Florida's provision for "automatic" review); *Pulley v. Harris,* 465 U.S. 37, 53, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (same); *Lowenfield,* 484 U.S. 37, 43 (1984) (noting Louisiana's automatic review

provision). Nevertheless, the Supreme Court has never explicitly held that a scheme *must* provide mandatory appellate review,[16] and its decisions do not appear to turn on whether appellate review is mandatory. Instead, the Court's decision focus on the quality of the review provided—i.e., whether it is meaningful.

In a case that squarely presented the question whether appellate review of a capital sentence must be mandatory, the Court majority, over vigorous dissent, declined to reach the issue on the merits because it found that the petitioner did not have standing. *Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (case brought by defendant's fellow death-row inmate in his own capacity and as "next friend" of defendant, who had waived his appeal). *See also Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976) (miscellaneous order terminating a stay of execution in a factually similar case).

In light of the dissent in *Whitmore,* the Supreme Court may one day revisit the issue and hold that appellate review of a death sentence must be mandatory. Be that as it may, the Court finds that Frank is not the proper defendant to bring this particular challenge to the FDPA at this time. Although, as *Whitmore* indicates, it is possible to imagine a scenario in which a defendant who had been sentenced to death under the FDPA was so resigned to his fate that he would knowingly and intelligently waive his right to appeal his sentence, this is not that case—at least not yet. There has been absolutely no indication that Frank, who has vigorously protected his rights in the pre-trial stages of this litigation, will forego an appeal of his sentence if he is in fact convicted and sentenced to death.

Thus, to the extent that the FDPA's failure to provide mandatory appellate review

---

**15.** The pertinent portion of the statute provides: In a case in which a sentence of death is imposed, the sentence shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time specified for the filing of a notice of appeal. An appeal under this section may be consolidated with an appeal of the judgment of conviction and shall have priority over all other cases.

18 U.S.C. § 3595(a).

**16.** The defendant does not cite a single case to that effect. Instead, he relies on the argument that "[b]ecause it lacks mandatory appellate review, the statute drastically undermines the heightened reliability standard imposed by the Constitution in capital cases."

raises a difficult question of law, the question must be posed by an individual who, unlike Frank, has actually suffered a harm as a result of this failure. Any harm to Frank that would be attributable to the lack of mandatory appellate review is simply too speculative at this time for the Court to reach the question on the merits. Accordingly, the Court holds that Frank lacks standing to bring this facial challenge to the FDPA. *See Whitmore,* 495 U.S. at 155, 110 S.Ct. 1717.

■ With respect to Frank's second challenge to the adequacy of the appellate review provided by the FDPA, the Court finds that he has utterly mischaracterized the statute. In addition to providing that an appeal from a sentence of death "shall have priority over all other cases," 18 U.S.C. § 3595(a), the FDPA provides *unlimited* review for the appellate court. The pertinent provisions are as follows:

(b) Review—The court of appeals shall review *the entire record* in the case, including—

(1) the evidence submitted during the trial;

(2) the information submitted during the sentencing hearing;

(3) the procedures employed in the sentencing hearing; and

(4) the special findings returned under section 3593(d).

(c) decision and disposition—

(1) *The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death,* and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592.

(2) Whenever the court of appeals finds that—

(A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

(C) the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure,

the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death. The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless.

The court of appeals shall state in writing the reasons for its disposition of an appeal of a sentence of death under this section.

18 U.S.C. § 3595 (emphasis added).

■ Frank focuses on subsection (2) of this section to the exclusion of the rest of the section. Thus, the appellate review that he portrays the FDPA as providing is considerably narrower than that which the statute actually provides. Although it is true that the appellate court may vacate a sentence of death where it finds arbitrariness, insufficiency of evidence, or properly preserved legal errors requiring reversal, this list of reasons is not exhaustive. Section 3595 explicitly provides that the appellate court "shall address *all* substantive and procedural issues raised on the appeal of a sentence of death." *Id.* at Section 3595(c)(1) (emphasis supplied). Bearing in mind that a statute should, if at all possible, be construed so as to be constitutional, *see Rust v. Sullivan,* 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), the Court finds that the portions of Section 3593 cited by Frank do not restrict the appellate court's scope of review. *See Kaczynski,* 1997 WL 716487, at *16; *Nguyen,* 928 F.Supp. at 1548.

■ As for the scope of review actually provided under the statute, the Court finds that it meets constitutional requirements. In

*Gregg,* the Supreme Court approved Georgia's death penalty scheme in part because its provisions for appellate review "serve[d] as a check against the random or arbitrary imposition of the death penalty." *Gregg,* 428 U.S. at 206, 96 S.Ct. 2909. Subsequent decisions have failed significantly to clarify the constitutional standard for appellate review. *See, e.g., Parker v. Dugger,* 498 U.S. 308, 321, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally.").

Although the precise content of "meaningful appellate review" remains unclear, the Court is satisfied that the FDPA provides it. The FDPA's appellate review provisions closely track those approved in *Gregg. See* 428 U.S. at 166–68, 96 S.Ct. 2909. For example, the Georgia statute directed the reviewing court to determine whether the death sentence was imposed "under the influence of passion, prejudice, or any other arbitrary factor," and to determine whether the sentencer's determination of the existence of a statutory aggravating factor was supported by sufficient evidence. *Id.* at·167, 96 S.Ct. 2909. This requirement is echoed and expanded in the FDPA's requirement that the court of appeals consider whether the sentence of death was imposed "under the influence of passion, prejudice, or any other arbitrary factor," Section 3595(c)(1), and whether the evidence supports any aggravating factor found by the jury. *Id.* In addition, the statute requires a written opinion stating the appellate court's reasons for disposing of any appeal from a sentence of death, regardless of outcome. *See* Section 3595(c)(3). Viewing the FDPA's appellate review scheme·in total—but noting in particular its authorization that the appellate court review the entire record of a capital case and address all substantive and procedural issues, in addition to its requirement of written findings—the Court finds that the Act's appellate review scheme adequately ensures against the ran-

dom and arbitrary imposition of death.[17] The Court therefore finds that the scheme is constitutional.

### b) Proportionality Review

 In light of the Court's conclusion that the FDPA provides sufficient appellate review to prevent the arbitrary imposition of death, Frank's argument regarding its failure to require proportionality review must be rejected. As the Supreme Court explained in *Pulley,* the proportionality review required in some state death penalty statutes

> presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime.

465 U.S. at 43, 104 S.Ct. 871. Frank argues that this sort of proportionality review by the appellate court is constitutionally required for all capital sentencing schemes, such as the FDPA, that "permit a jury to weigh nonstatutory aggravating factors in determining whether to impose a death sentence." According to the defendant,

> [w]here a wide range of evidence and arguments in support of a death sentence is admitted through the use of non-statutory aggravating factors, proportionality review is necessary "to ensure that the sentence of death in a particular case is·not disproportionate."

(Quoting *Gregg,* 428 U.S. at 198, 96 S.Ct. 2909.) The Court finds this argument unpersuasive, as has every other court confronted with a similar challenge. *See, e.g., Jones,* 132 F.3d at 240–41; *Kaczynski,* 1997 WL 716487, at *13–*14.

In *Pulley,* the Supreme Court explicitly rejected the argument advanced here by Frank. Faced with the argument that its prior decisions, particularly *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235

---

17. The Court also notes that the review provided under Section 3593 is concurrent with that of the appellate court over the underlying conviction. *See* 3595(a) ("An appeal under this section may be consolidated with an appeal of the judgment

of conviction."). A defendant who has been sentenced to death thus has two opportunities, which may be consolidated, to seek appellate review.

(1983), required proportionality review in every capital sentencing scheme, the *Pulley* Court explained what it understood to be the import of that decision:

> While emphasizing the importance of mandatory appellate review under the Georgia statute, we did not hold [in *Zant*] that without comparative proportionality review the statute would be unconstitutional. To the contrary, we relied on the jury's finding of aggravating circumstances, not the State Supreme Court's finding of proportionality, as rationalizing the sentence. Thus, the emphasis was on the constitutionally necessary narrowing function of statutory aggravating circumstances. *Proportionality review was considered to be an additional safeguard against arbitrarily imposed death sentences, but we certainly did not hold that comparative review was constitutionally required.*
>
> There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it.

*Pulley*, 465 U.S. at 50–51, 104 S.Ct. 871 (emphasis added) (internal citations omitted). *See also Walton v. Arizona*, 497 U.S. 639, 655, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) ("proportionality review is not constitutionally required"). Frank attempts to circumvent *Pulley*'s explicit holding by arguing that it applies only to cases where statutory aggravating factors alone may be submitted to the jury. He is unable to cite any legal authority in support of this distinction.

As stated above, the goal of proportionality review is to ensure that the death penalty is not imposed in a random or arbitrary fashion. *See Gregg*, 428 U.S. at 206, 96 S.Ct. 2909. The Supreme Court has never held, however, that proportionality review is mandatory. Instead, this mechanism has been described as "an additional safeguard against arbitrarily imposed death sentences." *Pulley*, 465 U.S. at 50, 104 S.Ct. 871. So long as a statutory scheme, taken as a whole, ensures a rational, evenhanded, and objective basis for the imposition of the death penalty, the Supreme Court's jurisprudence does not require that any one particular safeguard,

such as proportionality review, be used. *See Jones*, 132 F.3d at 241 ("[T]he Constitution does not mandate proportionality review . . . as long as the statute provides for other safeguards against an arbitrary imposition of the death penalty.").

Because the Court finds that the FDPA, taken as a whole, adequately prevents the arbitrary imposition of the death penalty, the fact that the FDPA does not mandate proportionality review does not render it constitutionally infirm. *See McCleskey*, 481 U.S. at 306, 107 S.Ct. 1756 ("where the statutory procedures adequately channel the sentencer's discretion, . . . proportionality review is not constitutionally required"). As noted previously, the statute sufficiently narrows at the outset the class of defendants whom Congress has deemed eligible for the death penalty. Appellate review, while not mandatory, is readily available and thorough. Such review is facilitated by the FDPA's requirement that the jury "return special findings identifying any aggravating factor or factors . . . found to exist." 18 U.S.C. § 3593(d). These features ensure that the appellate court has before it a clear, complete record, and the authority to vacate a sentence of death wherever it finds arbitrariness. The requirement that the appellate court issue a written opinion further safeguards against arbitrariness and facilitates Supreme Court review. In sum, the FDPA provides constitutionally adequate safeguards against the imposition of the death penalty in a random or arbitrary manner. Consequently, the defendant's challenges to the statutory scheme based on the alleged inadequacy of its review provisions must be dismissed in their entirety.

### 6. The Death Penalty as *Per Se* Cruel and Unusual

Frank's final challenge to the facial validity of the FDPA consists of his argument that the death penalty is cruel and unusual punishment under all circumstances. As every other court confronted with a challenge to the FDPA has noted, this argument is foreclosed by Supreme Court precedent. *See, e.g., Jones*, 132 F.3d at 242; *Kaczynski*,

1997 WL 716487, at \*19; *Davis,* 904 F.Supp. at 563–64.

In *Gregg,* the Supreme Court explicitly held that the death penalty does not *per se* violate the Eighth Amendment. *Gregg,* 428 U.S. at 168–87, 96 S.Ct. 2909. It is for the Supreme Court to determine whether that precedent should be revisited in light of evolving "standards of decency." *Id.* at 179, 96 S.Ct. 2909.

**B.** *The FDPA As Applied Against Frank*

Frank also challenges the Government's use of particular aggravating factors in this case, objecting specifically to both the statutory and non-statutory aggravating factors identified by the Government, all of which are set out *supra.*[18] The Court will first address the arguments with respect to the statutory aggravating factors.[19]

 1. The Statutory Aggravating Factors

 a) The homicide occurred in the course of a kidnapping.

■■■ Frank objects to the first statutory aggravating factor, that the homicide occurred during the commission of a kidnapping, on the grounds that it is unconstitutionally "duplicative" of the underlying death-eligible offense with which he is charged—*i.e.,* kidnapping in which a death results. Frank argues that the use of the factor violates the Eighth Amendment because

> it fails to genuinely narrow the class of persons who should be selected for the death penalty [because a] jury finding of an aggravating factor that merely replicates the underlying crime does not in any way distinguish one sentenced to death from one sentenced to a term of imprison-

ment. Under a weighing statute, such as the federal statute here, employing duplicative aggravating factors also unfairly pre-weighs the scales in favor of death, because the jury must necessarily find the existence of the aggravator when finding the defendant guilty of the capital crime. Thus, Frank's attack on the first statutory factor is two-fold: first, he claims that the factor is constitutionally infirm because it does not genuinely narrow the class of persons eligible for the death penalty; second, he claims that it unfairly tips the scales toward death. Neither argument has merit.

To evaluate the first argument—that the factor does not genuinely narrow the class of death-eligibles—it is important to understand the pool of individuals from which the defendant must be narrowed under the Eighth Amendment. *See United States v. Flores,* 63 F.3d 1342, 1370 (5th Cir.1995) ("[T]o figure out whether an aggravator narrows, we must first understand what class or category of offenses of offenders it must narrow from."). Frank suggests that the jury must be asked to compare him to all other defendants found guilty of a kidnapping in which death results, as opposed to all murderers, in deciding whether he should be put to death. If this were true, then the first statutory factor indeed would not provide the jury with much assistance in making the necessary distinction. *But see Jones,* 132 F.3d at 249 (noting that a jury could convict a defendant of kidnapping in which death results but find, at the penalty phase, that the defendant did not cause the death of the victim during the course of the kidnapping).

The Court finds, however, that this is not the case. The Eighth Amendment does not require that Frank be compared to all other

**18.** These objections are raised largely in Frank's Memorandum of Law in Support of Motion to Strike the Notice of Intent to Seek the Death Penalty. Some additional points are raised in the Memorandum of Law in Support of a Motion to Preclude Imposition of the Death Penalty and for Other Appropriate Relief.

**19.** In addition, Frank claims that all of the statutory and non-statutory aggravating factors fail to meet the minimum requirements for notice and specificity. In his motion papers, he requests that the aggravating factors be dismissed or, in the alternative, that the Government be ordered

to supply a "basic outline" of the evidence that it intends to offer in support of the factors. When this issue was raised with the parties at a conference held on March 12, 1998, the Government, speaking on the record, committed to providing the defendant by May 1, 1998, with a "basic outline" of its planned presentation of aggravating factors. The Court therefore will not address here the arguments presented with respect to the defendant's request for a Bill of Particulars, or with respect to his motion to strike these factors for lack of specificity.

defendants found guilty of a kidnapping in which death results, but rather that he be compared to all other persons who have committed murder. *See Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630 (so long as an aggravating circumstance does not apply to every defendant convicted of murder, it accomplishes the objective of narrowing the class of those eligible for death); *McCleskey,* 481 U.S. at 303, 107 S.Ct. 1756 ("a State must 'narrow the class of murderers subject to capital punishment'") (quoting *Gregg,* 428 U.S. at 196, 96 S.Ct. 2909); *Zant,* 462 U.S. at 879, 103 S.Ct. 2733 (approving Georgia capital sentencing scheme that used aggravating factors to distinguish death-eligible crimes from "the many Georgia murder cases in which the death penalty may not be imposed"); *Jurek,* 428 U.S. at 268–70, 96 S.Ct. 2950 (approving Texas capital sentencing scheme that authorized death penalty for five situations, including murder during a kidnapping, that were distinguishable from all other murders).

The federal statutory scheme under which Frank is prosecuted distinguishes him at least twice from all other murderers before the jury is even asked to consider the statutory aggravating factors. First, he is distinguished from all other murderers by being prosecuted under the federal kidnapping statute, which authorizes the death penalty where a death results. Since the death penalty is not authorized for all murderers, this initial distinction places Frank in a class of murderers whose crimes Congress has designated as being the worst and the most deserving of a sentence of death. *See Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630 ("the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or

its equivalent) at either the guilt or penalty phase"); *Jurek,* 428 U.S. at 270, 96 S.Ct. 2950 (approving Texas statute that narrows those eligible for death by limiting imposition of death penalty to those convicted of five classes of murders). *But see Jones,* 132 F.3d at 248–49 (concluding that the narrowing function does not occur under the FDPA until the penalty phase). Second, to ensure that the class of death-eligibles includes only those with the requisite culpable mental states, the FDPA requires the jury to find that Frank acted with one of the specified mental state elements. These two levels of distinction provide all of the narrowing that is constitutionally required.

Frank's second argument with respect to the duplicative factor raises a different issue tied to the FDPA's status as a weighing statute. The Court agrees with Frank that, if the jury convicts him at the guilt phase, it is highly likely—although not certain—that it will find the existence of the first statutory aggravating factor. *See Jones,* 132 F.3d at 249. Under a weighing statute, the jury is explicitly told that it must weigh the aggravating factors against mitigating factors.[20] Frank argues that, because the jury is likely to find that the first statutory aggravating factor exists, it will start its "weighing" process with the scales already tipped toward death.

The *Kaczynski* and *McVeigh* courts found this argument compelling and dismissed the same statutory aggravating factor as applied to the crimes alleged in those cases.[21] The *Kaczynski* court stated:

> To allow the jury to weigh as an aggravating factor a crime which they had already necessarily found beyond a reasonable doubt would unfairly tip the scale toward

---

**20.** In contrast, under a non-weighing statute,

> the jury must find the existence of one aggravating factor before imposing the death penalty but aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case.

*Stringer,* 503 U.S. at 229–30, 112 S.Ct. 1130. The aggravating factors used in weighing statutes generally have received more scrutiny from the Supreme Court than those used in non-weighing statutes, on the theory that once a jury is in-

structed to "weigh" particular aggravating factors, it will attach more importance to each factor than it would if instructed that it had been "cut loose" from the circumstances of the crime and given "absolute discretion to decide between life and death." Steiker and Steiker, *supra,* at 387 n. 153.

**21.** The statutory factor, set forth at 18 U.S.C. § 3592(c)(1), provides that the jury may consider as an aggravating factor the fact that the death occurred during the commission of any of twenty enumerated offenses.

death. This skews the weighing process by beginning the penalty phase with one aggravating factor already on death's side of the scale. Furthermore, when dealing with a weighing statute, there is always the danger that one or more jurors will weigh by counting.

*Kaczynski*, 1997 WL 716487, at \*23 (internal citations omitted). *See also McVeigh*, 944 F.Supp. at 1489–90. This Court respectfully disagrees.

Although there is certainly a danger that jurors will "weigh by counting"—and therefore that duplicative aggravating factors should not be submitted to the jury, *see Jones*, 132 F.3d at 250–52, *McCullah*, 76 F.3d at 1111; *Davis*, 912 F.Supp. at 947 [22]—the Court does not agree with the *Kaczynski* and *McVeigh* courts that an aggravating factor that duplicates elements of the underlying offense unfairly tips the scales toward death. Once the penalty phase has begun, the jury is asked to consider *only once* the fact that the murder occurred in the course of the commission of another crime. That the jury may find it relatively easy, based on its guilty verdict, to find the existence of this factor does not unfairly tip the scales toward death. *See Jones*, 132 F.3d at 249 ("the kidnapping was weighed *only once* by the jury during the penalty phase of the trial") (emphasis added).[23]

To the contrary, the FDPA's direction that, at the moment of sentencing, the jury should focus on the circumstances of the crime—and, in particular, the connection of the murder to another serious offense—represents a constitutional exercise of Congress's legislative power. *See id.* ("The submission of the elements of the crime as an aggravating factor merely allowed the jury to consider the circumstances of the crime when deciding whether to impose the death penalty."). Congress, by finding that violation of certain statutes shall support imposition of the death penalty, has made a judgment about society's condemnation of murder in a particular class of cases. It is entirely consistent with this judgment that Congress should ask the jury to weigh the fact that the murder occurred in the course of one of these same offenses at the time that it makes the sentencing decision. This is precisely the kind of principled guidance that the Supreme Court approved in *Gregg*, 428 U.S. at 192, 96 S.Ct. 2909 ("[T]he jury [should be] given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision.").

Indeed, to hold otherwise—and prohibit the Government from giving the jury any guidance as to how it should weigh the circumstances of the crime of which it has just

---

**22.** As the Tenth Circuit noted in *McCullah*,

> double counting of aggravating factors ... has a tendency to skew the weighing process and creates the risk that the death penalty will be imposed arbitrarily and unconstitutionally.... [W]hen the same aggravating factor is counted twice, the defendant is essentially condemned twice for the same culpable act, which is inherently unfair.

76 F.3d at 1111 (internal quotations omitted). The Court does not find—and Frank has not argued—that the first statutory aggravating factor is duplicative of any other aggravating factor.

**23.** At one point in his motion papers, Frank recognizes that "there is no constitutional problem with proving the homicide at a sentencing hearing if it has already been proved at trial." Memorandum of Law in Support of Defendant's Motion to Dismiss the Indictment in Whole or in Part, to Preclude the Government from Seeking the Death Penalty Based on Count V and Other Relief, at 18 n. 9.

> In other words, Frank claims that, because the kidnapping was merely an incidental step to

the killing—which was the intended crime—the kidnapping merges into the homicide and may not be used as a statutory factor.

This argument misunderstands the nature of the Indictment as well as the interplay of the kidnapping statute and the FDPA. Frank has been charged with kidnapping, not murder. Nevertheless, the additional element that the Government will attempt to prove at trial; *i.e.*, that a death resulted in the course of the kidnapping, makes him eligible for the death penalty under 18 U.S.C. § 1201. If the jury convicts Frank of kidnapping, and finds it will be asked to decide whether he should be sentenced to death for that murder.

In making that determination, the jury will be asked to consider as an aggravating factor the fact that the murder occurred in the course of a kidnapping. This factor is entirely applicable to the facts of this case. Moreover, charges to the jury at both the guilt and penalty phases will direct its attention to the separate findings it must make at each stage.

found the defendant guilty—defies common sense and invites arbitrariness into the jury's decision. To expect the jury to shut out entirely the circumstances of the underlying offense at the penalty phase blinks reality. Rather than let the jury guess at how it should factor the crime into the sentencing decision, it is better that the Government and the Court give it guidance that the crime shall count as one among other factors that should be weighed.

Finally, ignoring the crime at sentencing would be inconsistent with the Supreme Court's jurisprudence holding that the sentencer must take into account the individual characteristics of the crime and the defendant. *Tuilaepa,* 512 U.S. at 976, 114 S.Ct. 2630 ("[O]ur capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty."). Once the class of persons eligible for the death penalty has been sufficiently narrowed, as the Court finds that it has been here, the jury may take into account as an aggravating factor at sentencing the circumstances of the crime—even if that information of necessity duplicates elements of the underlying offense—so long as the factor is not duplicative of another aggravating factor. *See Walton,* 497 U.S. at 665, 110 S.Ct. 3047 ("We have, to be sure, held that the discretion-limiting aggravating factors can duplicate a factor already required by the definition of the crime...") (citing *Lowenfield*); *Lowenfield,* 484 U.S. at 246, 108 S.Ct. 546 ("the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm"). *Cf. Zant,* 462 U.S. at 888, 103 S.Ct. 2733 ("There would be no constitutional infirmity in an instruction [at the penalty phase] stating, in substance: 'If you find ... that the defendant is a person who has previously been convicted of a capital felony ... you will be authorized to impose the death sentence....'"). Accordingly, the Court will allow the use of the first statutory aggravating factor, which charges that the murder occurred during the commission of a kidnapping.[24]

The Court also finds unavailing Frank's arguments with respect to the second and third statutory aggravating factors, respectively, that the murder was committed in an "especially heinous, cruel, or depraved manner," and was the product of "substantial planning and premeditation." Frank objects to these statutory aggravating factors on the grounds that both fail adequately to narrow the class of murderers eligible for the death penalty. With respect to the third factor, Frank also claims that it is unconstitutionally vague. These arguments must be rejected.

b) The crime was committed in an especially heinous, cruel and depraved manner.

The second statutory factor alleges that "the defendant committed the offense in an especially heinous, cruel and depraved manner in that it involved torture or serious physical abuse to the victim." Frank correctly notes that the Supreme Court has held that, on its own, the phrase "especially heinous, cruel or depraved," does not provide a jury with constitutionally sufficient guidance in distinguishing among murderers. *See Walton,* 497 U.S. at 653–54, 110 S.Ct. 3047; *Maynard v. Cartwright,* 486 U.S. 356, 364–65, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

Frank ignores the other portions of the cases he cites, however, which hold that this particular phrase may pass constitutional muster if it is given a constitutional limiting instruction. For example, in *Maynard,* the Court held that a limiting instruction stating that the murder involved "some kind of tor-

---

24. Frank also contends that the first statutory aggravating factor should be dismissed because it does not apply to the underlying facts. This argument is unpersuasive and may be dismissed summarily. According to Frank:

To fall within the scope of the aggravating factor set forth in 18 U.S.C. § 3592(c)(1), a death must occur "during the commission of or attempted commission" of one of several enumerated offenses, in this case, a kidnap-

ping. This language was not meant to apply to cases where the defendant's intent was to kill and the kidnapping was merely the means to commit the crime, rather than an independent felony. Under such circumstances, the kidnapping is subsumed in, and a part of, the homicide, and the death does not occur during an independent crime of kidnapping, within the proper reading of the statute required by death penalty jurisprudence.

278

ture or serious physical abuse," would be sufficient. *Maynard,* 486 U.S. at 365, 108 S.Ct. 1853. Similarly, the Court in *Walton* held that the state court's limiting instructions, including that the perpetrator "inflict[ed] mental anguish or physical abuse before the victim's death," was constitutionally sufficient. *Walton,* 497 U.S. at 654–55, 110 S.Ct. 3047. *See also Proffitt,* 428 U.S. at 255–56, 96 S.Ct. 2960 (approving limiting instruction that defined "heinous, atrocious, or cruel" as including only "the conscienceless or pitiless crime which is unnecessarily torturous to the victim"). Here, the very limiting terms that have been approved by the Supreme Court in *Maynard* have been incorporated into the statute.

Frank's assertions to the contrary, it could not be said that "[a] person of ordinary sensibility" would find that this second statutory factor applies to every murder. *Godfrey,* 446 U.S. at 428, 100 S.Ct. 1759. *See Arave,* 507 U.S. at 474, 113 S.Ct. 1534 ("If the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the [factor] is constitutionally infirm.") (emphasis in original). Although every murder involves some physical abuse, not every murder will involve "torture or serious physical abuse to the victim." *See Pitera,* 795 F.Supp. at 557–58 (rejecting similar challenge to equivalent statutory aggravating factor under Anti–Drug Abuse Act). Accordingly, the Court rejects Frank's challenge to this aggravating factor on the ground that it provides the jury with insufficient guidance in distinguishing among the class of persons eligible for the death penalty.

c) The crime was the product of substantial planning and premeditation.

■ Similarly, the Court finds that the third statutory aggravating factor, that the murder involved "substantial" planning and premeditation, is sufficiently narrowing as to be considered by the jury. It cannot be said that every murder involves "substantial" planning and premeditation. *See Tipton,* 90 F.3d at 896; *Spivey,* 958 F.Supp. at 1531.

■ The third statutory factor also is not unconstitutionally vague. The Supreme Court has held that, "[f]or purposes of vague-

ness analysis ... our concern is that the factor have some common sense core of meaning ... that criminal juries should be capable of understanding." *Tuilaepa,* 512 U.S. at 975, 114 S.Ct. 2630 (internal quotations and citation omitted). As the Court noted in *Tuilaepa,* since *Furman* it has held an aggravating factor unconstitutionally vague on only a few occasions. *See Tuilaepa,* 512 U.S. at 974, 114 S.Ct. 2630. The factors invalidated on those occasions were in fact "quite similar to one another," *id.,* and involved "pejorative adjectives ... that describe a crime as a whole," *id.* (quoting *Arave,* 507 U.S. at 472, 113 S.Ct. 1534).

The substantial planning factor does not involve pejorative terms, but focuses the jury instead on the degree of planning associated with the crime. While many murders may involve some planning, not every murder involves "substantial" planning. The Court finds that the statutory factor has a common sense core of meaning that the jury is capable of understanding. The Court therefore joins the numerous other courts that have considered the "substantial planning" aggravating factor in holding that it is not unconstitutionally vague. *See, e.g., Tipton,* 90 F.3d at 896; *McCullah,* 76 F.3d at 1110; *Flores,* 63 F.3d at 1373–4; *McVeigh,* 944 F.Supp. at 1490.

d) Request for a hearing

■ The Court also denies Frank's request for a pre-trial hearing to rule on the sufficiency of the evidence to support all of the alleged statutory aggravating factors. In denying this request, the Court bears in mind three considerations. First, the Government provided Frank on May 1, 1998, over a month before the start of the guilt phase of the trial, with a "basic outline" of the presentation it plans to make during the penalty phase as to aggravating factors. Second, much of the evidence that the Government will use in its presentation of the statutory aggravating factors is likely to come out during the guilt phase of the trial. For example, evidence of the fact that Price was burned to death—which is relevant to whether the offense "involved torture or serious physical abuse to the victim"—is likely to

be presented to the jury during the guilt phase. Similarly, evidence of the defendant's premeditation of the crimes is likely to be introduced as relevant to his motive. It goes without saying that evidence of the kidnapping also will be introduced during the guilt phase. In light of these two considerations, Frank is unlikely to be surprised by the evidence offered at the penalty phase to establish the statutory aggravating factors. Third and finally, as discussed above, the FDPA provides a gate-keeper role for the Court at the penalty phase. To the extent that any evidence is more unfairly prejudicial than it is probative, the Court will exclude it from the jury's consideration. It is also important to recall that the penalty phase is an adversarial proceeding, wherein the defendant is "permitted to rebut any information received at the hearing," and may "present argument as to the adequacy of the information to establish the existence of any aggravating factor." 18 U.S.C. § 3593(c). Taking all of these considerations into account, the Court finds that it is unnecessary to hold a pre-trial hearing on the sufficiency of the evidence to support the statutory aggravating factors, and that the defendant will not be prejudiced by the Court's decision not to hold such hearings.

2. The Non–Statutory Aggravating Factors

 (a) The victim was killed in an effort to obstruct justice.

Frank objects to the first non-statutory aggravating factor, *i.e.*, that the victim was killed in an effort to obstruct justice, as unconstitutionally vague and non-specific. The Court finds that the essence of this objection is the defendant's claimed lack of notice as to the facts that the Government intends to offer to establish this factor. Since, as noted above, the Government has provided a "basic outline" of the evidence it intends to offer with respect to all aggravating factors, the Court finds that this objection is mooted.

 b) The defendant represents a continuing danger.

▮▮▮ Frank next objects to the factor concerning whether he represents a continuing

danger, on the grounds that Congress did not intend such a factor to be considered separately. According to Frank, Congress's choice "to set forth several specific statutory aggravating factors regarding the defendant's past conduct that are closely correlated with a defendant's likelihood of committing violent crimes in the future" precludes the Government from introducing any non-statutory aggravating factors addressed to future dangerousness.

This argument is unpersuasive as a matter of statutory construction. If Congress had meant the statutory aggravating factors to provide an exhaustive list of factors that could be submitted with respect to the defendant's past criminal behavior and future propensities, it would have said so, and nowhere in the statutory language is such an exclusion even implied. *Cf. Davis*, 912 F.Supp. at 949. *See also Spivey*, 958 F.Supp. at 1534. Moreover, past criminal behavior, while it may provide insight into the likelihood that an individual will commit a crime again, is not necessarily submitted to the jury for that reason alone. The FDPA reflects a judgment by Congress that, in determining whether an individual is deserving of the death penalty, the jury should consider past criminal behavior as an aggravating factor in and of itself, distinct from future dangerousness. The Court thus finds no statutory impediment to the jury's being instructed that it may take future dangerousness into account in addition to prior criminal acts. Nor does it find any constitutional impediment. Although related, these factors are distinguishable. Therefore, the submission of both factors to the jury does not unfairly tip the scales toward death.

c) The Use of Unadjudicated Criminal Acts

▮▮▮ Closely related to the preceding argument is Frank's claim that the FDPA and the Constitution preclude the introduction at the penalty phase of any information regarding unadjudicated prior crimes by the defendant. Frank argues, as a general proposition, that information regarding unadjudicated criminal acts is precluded under Section 3593's evidentiary standard, because such information is inherently prejudicial and confusing to the jury. Frank also

claims that the use of such information violates the Constitution, because it is inherently unreliable and therefore inconsistent with the Supreme Court's jurisprudence calling for heightened reliability in capital sentencing.

The Court finds both of these *per se* arguments unavailing. With respect to the statutory argument, the Court finds that Section 3593 does not erect a *per se* barrier to the admission of any evidence. To the contrary, Section 3593 creates a flexible standard that applies to specific information as it becomes available and that allows such information to be viewed in the context of all the circumstances of the particular case. With respect to the constitutional argument, the Court likewise finds that there is no *per se* barrier to the introduction of unadjudicated prior criminal acts. *See Tuilaepa*, 512 U.S. at 976, 114 S.Ct. 2630 (approving as an aggravating factor the defendant's participation in prior criminal acts, even if unadjudicated, involving violence or the threat of violence). As set forth above, the heightened reliability standard in the Supreme Court's death penalty jurisprudence is actually a reminder that the decision to sentence a person to death must be individualized. It is, in that sense, a call for heightened reliability in ascertaining that *this* individual should be put to death. The Court therefore declines to find that the Constitution renders unadjudicated criminal conduct *per se* inadmissible. *See United States v. Beckford*, 964 F.Supp. 993, 997–1000 (E.D.Va.1997); *Davis*, 912 F.Supp. at 948–49.

d) The crime caused severe and irreparable harm to the family of the victim.

■■■ Frank also objects to the non-statutory aggravating factor that the defendant caused severe and irreparable harm to the family of his victim. Frank argues that, although such evidence might be appropriate in certain cases, the government has failed to set forth in its pleading here the way in which the harm to the family was "worse" than it would be as a result of any murder.

■■■ Evidence of the harm to the victim's family resulting from a murder is classic victim impact evidence, which the FDPA explicitly authorizes. *See* Section 3593(a). Thus, as a matter of statutory construction,

the factor is proper. The factor also is proper as a matter of constitutional law. Just as this Court found with respect to the defendant's argument that the death penalty is *per se* unconstitutional, the Court finds that it is precluded by Supreme Court precedent from finding for the defendant with respect to this argument. After a review of the principles guiding sentencing over recent centuries, the Supreme Court, in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), explicitly upheld the use of victim impact evidence in determining whether the death penalty should be imposed. *Id.* at 827, 111 S.Ct. 2597. The Court concluded:

> Courts have always taken into consideration the harm done by the defendant in imposing sentence.... [Accordingly,] [w]e are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.

*Id.* at 825, 111 S.Ct. 2597. In light of the Supreme Court's holding in *Payne*, this Court finds that it is precluded from finding, as the defendant urges, that because "the harm shown by victim impact evidence is simply the harm implicit in any murder, it violates the Eighth Amendment." Thus, there is no *per se* bar to the use of victim impact evidence as an aggravating factor. To the extent that Frank argues simply that there is insufficient evidence to support the use of this aggravating factor in his case, the Court finds that now is not the time to test the Government's evidence to support any of its aggravating factors.

e) The crime was committed in violation of a judicial order of protection.

■■■ Finally, Frank objects to the non-statutory factor that the crime was committed in violation of a judicial order of protection, on the grounds that it duplicates a crime charged in the Indictment. Even if this were true, for the reasons set forth above with respect to the first statutory aggravating factor—which Frank also claimed was duplicative of a crime charged in the

Indictment—the Court finds that this objection is unavailing.

With respect to Frank's argument that allowing this factor would invite the Government to "list as aggravators every lesser included offense the defendant committed along the way," the Court finds this reasoning unpersuasive. In this case, at least, the Government has not done that. Violating an order of protection is not a lesser included offense of any of the crimes charged in the Indictment. Even if the crime was committed against the same victim who ultimately was murdered, the violation of the judicial order is a separate crime that the jury is entitled to take into account in evaluating whether this particular individual should be sentenced to death.

For the foregoing reasons, the defendant's motion to strike the statutory and non-statutory aggravating factors from the Notice of Intent to Seek the Death Penalty is denied.

## C. *The Propriety of Proving a Murder Only at the Penalty Phase*

 An interesting satellite to Frank's attack on the constitutionality of the FDPA is his argument that the Act created a crime of "capital kidnapping"—as distinct from ordinary kidnapping—the elements of which include an intentional murder. According to Frank, the Government must charge him with all of the elements of capital kidnapping and prove all of these elements during the guilt phase of the trial, instead of putting off until the penalty phase proof of the murder. Because even the Superseding Indictment does not charge Frank with the elements of an intentional murder, Frank argues that it must be dismissed.

This argument, while intuitively appealing, must be rejected. As a matter of statutory construction, it is unmistakably clear that the FDPA did not create a separate crime of "capital kidnapping." Instead, the FDPA retained the definition of "kidnapping" codified at 18 U.S.C. § 1201(a), and amended it by authorizing the death penalty for kidnapping when it results in a death. *See* Pub.L. No. 103–322, Sec. 60003(a)(6), *reprinted in* 1994 U.C.C.A.N. (108 Stat.) at 1069. As it does in the case of all other crimes for which the death penalty is authorized when the crime results in death, *e.g.*, bank robbery, hostage taking, or sexual abuse, *see id.* at Section 60003(a)(9), (10) and Section 60010, the FDPA explicitly directs that proof of the defendant's intent to kill shall be considered by the jury at the penalty phase. *See* 18 U.S.C. § 3591. The FDPA requires that a jury find beyond a reasonable doubt that the defendant had at least one of four mental states before he may be found eligible for the death penalty, but it provides that such a determination shall be made "at the hearing under Section 3593"—*i.e.*, at the sentencing hearing. *Id.* at § 3591(a)(2).

Consistent with this ordering of events, the FDPA directs that the determination of the defendant's mental state shall occur after the defendant has been found guilty of an offense for which a sentence of death is authorized. *Id.* at § 3591(a). The Court therefore finds no support in the statute for the defendant's argument that Congress created a separate crime of capital kidnapping, as opposed to an analogue to a sentence enhancement, when it authorized the death penalty for kidnappings in which a death results. *See Jones,* 132 F.3d at 247. Because all of the elements of kidnapping have been alleged in the Indictment, the Court finds that the Indictment is sufficient and that the Government need not prove in its case-in-chief the defendant's homicidal intent as an element of the crime of "capital kidnapping." *See Almendarez–Torres v. United States,* — U.S. —, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (sentencing enhancement factors need not be charged in the indictment or proved at trial); *Nguyen,* 928 F.Supp. at 1545.

 Frank also raises a constitutional argument as to why proof of the murder should not be put off until the penalty phase. He points to

> the due process and fundamental unfairness of relegating proof of an intentional homicide to a penalty phase proceeding that is not governed by the Rules of Evidence and that focuses on the defendant's character rather than the crime.

This argument also has intuitive appeal. Indeed, the Rules of Evidence do not apply at

the penalty phase, and the jury's determination of the defendant's mental state may be polluted by the jury having heard considerable negative information about the defendant that the Government argues weighs in favor of a sentence of death. No other court faced with a death penalty prosecution appears to have been confronted with this precise argument.

Nevertheless, the Supreme Court has explicitly held that proof of a defendant's intent to kill—necessary to support imposition of the death penalty under the Eighth Amendment, *see Enmund,* 458 U.S. at 801, 102 S.Ct. 3368—may be put off until the penalty phase of a capital prosecution. In *Cabana. v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), the Court stated that "[a]t what precise point in its criminal process a State chooses to make the *Enmund* determination is of little concern from the standpoint of the Constitution." *Id.* at 386, 106 S.Ct. 689. Accordingly, what matters for purposes of the Eighth Amendment is that "at some point in the process, the requisite factual finding as to the defendant's culpability has been made." *Id.* at 387, 106 S.Ct. 689. *See Almendarez–Torres,* — U.S. at —, 118 S.Ct. at 1232 (collecting cases where the Supreme Court has held that a judge, rather than a jury, may determine the existence of factors that make a defendant eligible for the death penalty).

The *Cabana* holding strongly suggests that the FDPA's provision for a jury finding as to the defendant's mental state at a point in the proceedings when the Federal Rules of Evidence no longer apply—and when other "aggravating" evidence has been introduced—is not unconstitutional. Although the Supreme Court has held that a defendant may not be put to death where he did not possess the minimal mental culpability set forth in *Enmund,* the Supreme Court has never explicitly held that this determination must be made

under the Federal Rules of Evidence. Accordingly, the Court finds that proof of the defendant's mental state properly may be put off until the penalty phase of the proceedings.

### D. The Constitutionality of the Violence Against Women Act

▮ Varying his attack on the Indictment, Frank argues that the Violence Against Women Act ("VAWA"), 18 U.S.C. §§ 2261 *et seq.,* is unconstitutional and that Counts Two, Three, and Four of the Indictment therefore must be dismissed.[25] Citing *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Frank claims that Congress exceeded its power under the Commerce Clause when it enacted the VAWA. Particularly as applied to him, Frank claims that the VAWA is unconstitutional, since his case "involves the bare crossing of state lines."

▮ The Court finds that the VAWA represents a valid exercise of Congress's Commerce Power. Rather than attempt to replicate it, this Court relies on the Honorable Barrington Parker's well-reasoned opinion, *United States v. Gluzman,* 953 F.Supp. 84 (S.D.N.Y.1997), which held, as a matter of first impression in this Circuit, that the VAWA was constitutional under the Commerce Clause. In short, the Court finds that Congress may rationally have decided that domestic violence is a problem of national importance, with a significant effect on interstate commerce. In addition, with respect to the claim that the VAWA is unconstitutional as applied to this case, the Court simply notes, as did Judge Parker, that "courts consistently have upheld federal criminal statutes that regulate the crossing of state lines by persons or things in a manner incident to some criminal activity." *Id.* at 89. This portion of the defendant's motion therefore is dismissed.[26]

---

**25.** This argument is raised in the Defendant's Motions to Dismiss the Indictment in Whole or in Part, to Preclude the Government from Seeking the Death Penalty Based on Count V, and for Other Relief.

**26.** The defendant also claims that he may not be prosecuted for kidnapping *and* the VAWA of-

fenses, because "kidnapping ... is merely a more general, lesser included version of the domestic violence offense involving murder charged in Count Four." This argument is unavailing. It is well established that if

the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there

E. *The Propriety of the Government's Decision to Seek the Death Penalty Against Frank*

 Finally, Frank challenges the propriety of the Government's decision to seek the death penalty in this case. Frank points to "other, more serious, cases in the [Southern District of New York] in which the government has foregone seeking the death penalty," as well as the fact that "the only three defendants against whom the death penalty has been sought in the Southern District [of New York] are African–American," and suggests that "arbitrary factors are at work in the selection of capital cases by prosecutors." The Government has responded that the decision to seek the death penalty in this case was based entirely on proper considerations, including, most importantly, the aggravated nature of the crime. Frank asks that the Court preclude imposition of the death penalty on the basis of this arbitrariness or, in the alternative, that it require the Government to provide to the defense "documents underlying the decision to seek the death penalty in this case."

 This request must be denied in all its forms. Frank has adduced absolutely no evidence suggesting that the Government abused its discretion in seeking the death penalty in this case. He relies instead on conclusory allegations, including an implicit allegation of racial discrimination. In the absence of any evidence to the contrary, the Court must presume that the prosecution was undertaken in good faith. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before

a grand jury, generally rests entirely in [her] discretion.").

Even in the capital context, the Supreme Court has noted favorably "the capacity of prosecutorial discretion to provide individualized justice." *McCleskey*, 481 U.S. at 311–12, 107 S.Ct. 1756. The significance of the Supreme Court's deference to prosecutorial discretion is that, as the *Davis* court noted, "a general challenge to the ability of the government to decide to pursue capital punishment against certain defendants must fail." 904 F.Supp. at 560. Certainly, the selection of certain defendants for capital prosecution on the basis of race would be impermissible. Nevertheless, because of the importance of prosecutorial discretion, the Supreme Court has held that it would demand "exceptionally clear proof before we would infer that the discretion has been abused." *McCleskey*, 481 U.S. at 297, 107 S.Ct. 1756.

Here, Frank's arguments in support of an abuse of discretion by the United States Attorney's Office in the Southern District of New York do not come close to meeting the "exceptionally clear proof" standard that might necessitate an *in camera* review of the documents requested by the defendant regarding the Government's selection process, let alone an order that they be turned over to the defendant. *Compare id.* (holding that the Baldus study, an extensive study examining over 2,000 murder cases in Georgia, was "clearly insufficient to support an inference that any of the decisionmakers ... acted with discriminatory purpose"). Finding absolutely no evidence that the Government has acted with an improper motive, or otherwise arbitrarily, the Court denies this portion of Frank's motion. *See Davis*, 904 F.Supp. at 559–60; *Nguyen*, 928 F.Supp. at 1544–45. For the same reasons, the Court denies Frank's motion for a hearing on the Govern-

are two offenses or only one is whether each provision requires proof of a fact which the other does not.
*Rutledge v. United States*, 517 U.S. 292, 116 S.Ct. 1241, 1245, 134 L.Ed.2d 419 (1996) (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).
Here, Count IV requires proof of intimate partnership. This fact is not required for Count V. Count V requires proof of "holding," the heart of kidnapping, which is not an element of Count IV.

Count IV requires that the defendant knowingly caused his intimate partner to travel across a State line by "force, coercion, duress, or fraud," but says nothing about holding. Finally, Count V requires proof that the holding was for the purpose of assaulting or killing the victim "and for other purposes." Count IV does not contain as an element of the crime that the defendant caused his partner to travel across state lines for any particular purpose.

ment's use of non-statutory factors throughout the nation.

Lastly, Frank's request to review the materials that the Government prepared and considered in making its decision to seek the death penalty must be denied. The Government resists the production on the ground, *inter alia*, that the materials are covered by the deliberative process privilege. The United States Attorneys Manual ("USAM") requires every United States Attorney to prepare a "Death Penalty Evaluation" form in every case in which a defendant is charged with an offense subject to the death penalty, whether or not the United States Attorney intends to seek that penalty. USAM § 9–10.040. As the defendant's own papers recognize, many such prosecutions are brought without the Government ever filing a Notice of Intent to Seek the Death Penalty. There are strong policy reasons in favor of keeping confidential the internal deliberative process through which the Government decides whether to use its prosecutorial power to seek the most severe punishment possible. Through an unrestrained and multi-level review, which gives an opportunity for defense counsel participation at each stage of the deliberative process (both at the local United States Attorney's Office and at the Department of Justice in Washington, D.C.), prosecutors are encouraged and required to evaluate carefully the strengths as well as the weaknesses of their cases, along with the factors in favor of and opposed to the imposition of the death penalty. Defense counsel are given the opportunity to present to the Department of Justice any evidence of racial bias in the Government's administration of the federal death penalty. *Id.* at § 9–10.050. In determining whether to seek the death penalty, Government officials are instructed to consider any mitigating factor reasonably raised by the evidence in the light most favorable to the defendant and to satisfy themselves that there is sufficient admissible evidence of aggravating factors to both obtain a death sentence and to sustain it on appeal before filing a Notice of Intent to Seek the Death Penalty. *Id.* at § 9–10.080. Discovery of the deliberative materials would have a chilling effect on the thorough evaluation of these issues and hinder the just,

frank, and fair review of the decision for every individual defendant who faces the prospect of receiving a Notice of Intent to Seek the Death Penalty.

## III. CONCLUSION

For the foregoing reasons, the defendant's motions to dismiss the Indictment, to strike the Notice of Intent to Seek the Death Penalty, and to preclude imposition of the death penalty are denied. The Court does not find that the FDPA or the VAWA are unconstitutional on their face or as applied to this defendant, or that the Indictment subjects him to multiple prosecutions for the same crime. The Court finds that the Government may put off proof of a murder until the penalty phase. The Court denies the defendant's request for a pre-trial evidentiary hearing on the Government's use of non-statutory factors around the nation or on the sufficiency of the evidence to support the aggravating factors alleged in this case. Finally, the Court denies the defendant's request that the Government turn over documents regarding its decision to seek the death penalty against Frank.

SO ORDERED: