**UNITED STATES of America,
Plaintiff,**

v.

**Buford O'Neal FURROW,
Jr., Defendant.**

**No. CR 99–838 RAP.**

United States District Court,
C.D. California.

May 1, 2000.

Marilyn E. Bednarski, Sean Kennedy, William H. Forman, Office of the Federal Public Defender, /Los Angeles, CA, Judy ·C. Clarke, Office of the Federal Public Defenders, Eastern Washington & Idaho, Spokane, WA, for Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DEATH PENALTY EVALUATION FORM AND PROSECUTION MEMORANDUM**

PAEZ, District Judge, Sitting by Designation.

## I.

### *Introduction*

Defendant Buford O'Neal Furrow, Jr. has been charged in a sixteen-count superseding indictment with, *inter alia,* violations of 18 U.S.C. § 245 (Interference with Federally Protected Activities Resulting in Death), 18 U.S.C. § 1114 (Murder of a Federal Employee), and 18 U.S.C. § 924(c)(j) (Use of a Firearm During a Crime of Violence Resulting in Death), stemming from defendant's alleged murder of U.S. Postal Worker, Joseph Ileto, and other hate crimes stemming from the alleged shooting of five persons at the North Valley Jewish Community Center on August 10, 1999. Three of the offenses with which defendant has been charged carry a potential sentence of death.

Pending before the Court is defendant's Motion to Compel Production of the "Death Penalty Evaluation Form" and supporting prosecution memorandum, submitted by the United States Attorney for the Central District of California to the Attorney General's Death Penalty Committee setting forth his recommendation

that the Attorney General authorize the United States Attorney to seek the death penalty against defendant. Pursuant to Department of Justice ("DOJ") guidelines, defendant is permitted to present an argument to the Attorney General's Death Penalty Committee as well, in an effort to persuade the Attorney General from seeking the death penalty.

Defendant argues that, without copies of the Death Penalty Evaluation Form and prosecution memorandum, his attorneys cannot present a meaningful argument before the committee, effectively denying him of his Sixth Amendment right to counsel. He also argues that both the Brady Doctrine and the DOJ guidelines require disclosure of the documents. The government counters that the documents are protected by the deliberative process and work product privileges. The Court agrees with the government: the Death Penalty Evaluation Form and prosecution memorandum are internal government documents created as part of a deliberative process. As such, they are protected from disclosure. Furthermore, neither the Sixth Amendment, the Brady Doctrine, nor the DOJ guidelines impart personal rights in defendant which create an exception to these privileges in this case.

## II.

### *Procedural Background*

Defendant initially appeared before the Court on August 12, 1999. He was indicted on August 19, 1999 and a trial date of October 12, 1999 was set.

The Court appointed the Federal Public Defender's office as counsel for defendant. On September 8, 1999, upon the request of defendant's counsel, the Court appointed Judy Clarke as co-counsel. Ms. Clarke has substantial experience in representing defendants charged with capital offenses.[1]

The Court held a status conference on September 8, 1999. At the request of both parties, the Court vacated the original trial date of October 12, 1999. The Court scheduled a status conference for October 12, 1999 and reserved setting a new trial date until that conference.

On October 7, 1999, the parties proposed a number of deadlines and dates to complete the Attorney General's death penalty authorization process as outlined in the United States Attorneys' Manual ("USAM") at §§ 9–10.000, et seq. At the October 12, 1999, status conference, the Court set the following dates:

1. December 6, 1999: deadline for defense counsel to deliver written submission of mitigating factors to U.S. Attorney's office.

2. January 7, 2000: deadline for U.S. Attorney's Office to send death penalty submission (including materials provided by defense counsel) to the Department of Justice. Between December 6, 1999 and January 7, 2000 counsel for defendant and the government were to meet to discuss this issue.

3. February 15, 2000: deadline for government's decision whether to file a notice of intent to seek the death penalty.

4. February 22, 2000, 1:30 p.m.: status conference-government to notify Court of its intent to seek the death penalty.

On December 2, 1999, the government filed its First Superseding Indictment. The arraignment pursuant to this indictment occurred on February 15, 2000.

Pursuant to the dates set at the October 12, 1999, status conference, counsel for defendant presented to the local United States Attorney a written mitigation argument on December 13, 1999, and an oral argument on January 19, 2000. At the

---

1. The Federal Death Penalty Act of 1994 requires the appointment of two lawyers in capital cases, including at least one lawyer,

"learned in the law applicable to capital cases." 18 U.S.C. § 3005.

January 19, 2000, meeting, defense counsel requested the government produce a copy of the government's Death Penalty Evaluation Form and prosecution memorandum. The government denied this request on January 24, 2000. Defense counsel presented an oral argument before the Attorney General's Death Penalty Committee (the "Committee") on January 31, 2000. At that hearing, defense counsel presented its request for production of the government's evaluation form and prosecution memorandum to the Committee. The chairman of the Committee refused the request. Defendant filed this motion on that day.

Defendant also filed a motion to stay the Attorney General's decision of whether to authorize the death penalty. The Court denied that motion on February 8, 2000.

On February 10, 2000, the government notified the Court of its intent to seek the death penalty against defendant.

## III.

### *Discussion*

#### A. The Federal Death Penalty and the Death Penalty Evaluation Form

The Federal Death Penalty Act of 1994 (the "FDPA") created general procedures for imposing a death sentence and designated over forty federal crimes as eligible for the death penalty.[2] 18 U.S.C. §§ 3591–3598. The statute requires a bifurcated trial, with separate guilt and sentencing phases, and that the government provide notice to defendant "a reasonable time before trial" of its intent to seek the death penalty. 18 U.S.C. § 3593(a). The notice must set forth the aggravating fac-

tors the government intends to prove at the penalty phase. 18 U.S.C. § 3593(a)(2).

Shortly after the FDPA was enacted, the Attorney General issued guidelines setting forth internal policies and procedures for the prosecution of all federal cases in which a defendant is charged with a death-eligible offense. USAM (Capital Crimes), § 9–10.000, et seq. The guidelines confirm the statutory requirement and long-standing Department of Justice practice that, in all federal capital cases, the ultimate decision to seek the death penalty lies with the Attorney General. *Id.* at §§ 9–10.020, 9–10.080. The guidelines established the Attorney General's Death Penalty Committee, to aid the Attorney General in this decision. *Id.* at § 9–10.050; Little, at 410.

Pursuant to the guidelines, the local United States Attorney ("USA") initially reviews each case and decides whether to request the Attorney General's approval to seek the death penalty. Prior to making this decision, defense counsel is granted an opportunity, "to present any facts, including any mitigating factors, to the United States Attorney for consideration." *Id.* at § 9–10.030. If the USA decides to request such approval, the USA must inform defense counsel. *Id.* at § 9–10.000B. The USA then submits his recommendation, contained in a death penalty evaluation form and prosecution memorandum, to the Committee. *Id.* at § 9–10.000C; Death Penalty Evaluation Form (DOJ Manual, Appendix A, p. 9–246.13).

> Following (i) an introduction, the prosecution memorandum must include a comprehensive discussion of (ii) the theory of liability, (iii) the facts and evidence, including evidence relating to any

**2.** Although federal crimes have provided for the death penalty since 1790, federal death penalty statutes were not enforced from 1972 through 1988 as a result of the Supreme Court's decision, in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), that fully discretionary death penalty statutes are unconstitutional. In 1988, Congress created procedures for imposing the

death penalty for violations of the Continuing Criminal Enterprise statute. Rory K. Little, The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role, 26 Fordham Urban L.J. 347, 349 (1999). Because this statute is infrequently invoked, the death penalty was not largely enforced for federal crimes until the FDPA was enacted. *See id.*

aggravating or mitigating factors, (iv) the defendant's background and criminal history, (v) the basis for Federal prosecution, and (vi) any other relevant information.

*Id.* at § 9–10.000C.

Defendant is afforded another opportunity to persuade the government from seeking the death penalty, by presenting argument before the Committee. The guidelines provide that "[c]ounsel for the defendant shall be provided an opportunity to present to the Committee, orally or in writing, the reasons why the death penalty should not be sought." *Id.* at § 9–10.000D.

The Committee reviews all submissions and submits its recommendation to the Attorney General, who makes the final determination whether to seek the death penalty in a particular case. *Id.* at §§ 9–10.000A, 9–10.000D.

## B. The Deliberative Process Privilege

■ The Supreme Court has recognized a 'deliberative process' privilege which protects from discovery all "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formed." *N.L.R.B. v. Sears Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (internal quotations removed). By shielding such documents from discovery, the rule seeks to protect the integrity of governmental decision making. The privilege is premised on the notion that if governmental officials know their reports or memoranda could be made public, they might be inhibited in their discussion or analysis of critical issues. Such inhibition could result in less deliberate decision making, thereby compromising the integrity or quality of any final decision. *Id.* at 150–1, 95 S.Ct. 1504.

■ Because the rule seeks to maintain the quality of deliberations, it protects only pre-decisional materials. *Id.* at 151, 95 S.Ct. 1504; *Klamath Water Users Protec-*

*tive Ass'n v. U.S. Dept. of Interior,* 189 F.3d 1034 (9th Cir.1999). And, of course, the materials must be part of the deliberations. *Assembly of the State of California v. U.S. Dept. of Commerce,* 968 F.2d 916, 920 (9th Cir.1992) ("In order to be protected by the deliberative process privilege, such a document must be both "pre-decisional" and "deliberative." ").

■ The Death Penalty Evaluation Form and the prosecution memorandum are both deliberative and pre-decisional. The guidelines provide:

Following (i) an introduction, the prosecution memorandum should include a comprehensive discussion of (ii) the theory of liability, (iii) the facts and evidence, including evidence relating to any aggravating or mitigating factors, (iv) the defendant's background and criminal history, (v) the basis for Federal prosecution, and (vi) any other relevant information. **The Death Penalty Evaluation form is intended primarily to be used as a guideline and work sheet for the internal decision making process, and may be hand written.**

USAM, § 9–10,040 (emphasis added). The evaluation form and memorandum are designed to help the Attorney General decide whether the death penalty is appropriate in any case in which the death penalty is a potential sentence. They are part of a deliberative and pre-decisional process; accordingly, they fall within the 'deliberative process' privilege, and the government should not be compelled to produce them to defendant.

Two cases cited by defendant support this holding. In *Nadler v. U.S. Dept. of Justice,* 955 F.2d 1479 (11th Cir.1992), a state trial court judge sought to compel the FBI and the DOJ, under the Freedom of Information Act, to produce documents relating to an investigation the agencies had conducted of the judge's suspected acceptance of bribes. The court found that internal memoranda from a DOJ prosecuting attorney to his supervisor, in

which the attorney recommended how the government should proceed in the case, were both "predecisional" and "deliberative" and therefore within the umbrella of the deliberative process rule. *Id.* at 1491. Similarly, in *Antonelli v. Sullivan,* 732 F.2d 560, 561 (7th Cir.1983), the Seventh Circuit applied the privilege to shield an internal United States Attorney's Office prosecution memorandum from production in a convicted defendant's suit under the Freedom of Information Act for all documents relating to his conviction.

Although it did not specifically refer to the deliberative process privilege, the District Court for the Southern District of New York refused to compel production of the same type of materials sought by defendant. *See U.S. v. Deric Frank,* 8 F.Supp.2d 253, 284 (S.D.N.Y.1998). The court noted that strong policy reasons favor the protection of such materials.

> Discovery of the deliberative materials would have a chilling effect on the thorough evaluation of these issues and hinder the just, frank, and fair review of the decision for every individual defendant who faces the prospect of receiving a Notice of Intent to Seek the Death Penalty.

*Id.*

The documents also fall within the aegis of the more general work product privilege, which protects from discovery materials prepared by an attorney in anticipation of litigation. *Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *U.S. v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)(applying the work product rule to criminal cases). This privilege is also recognized in Fed. R.Crim.P. 16. The rule exempts from production,

> reports, memoranda, or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case[.]

Fed.R.Crim.P. 16(a)(2). At least one other district court has reached this same conclusion. The District Court of Kansas has found that the work product privilege bars production of the evaluation form and prosecution memorandum. *See U.S. v. Phouc H. Nguyen,* 928 F.Supp. 1525, 1552 (D.Kan.1996).

For the foregoing reasons, the Court finds that the USA's Death Penalty Evaluation Form and prosecution memorandum fall within the scope of the deliberative process and work product privileges.

### C. Defendant's Arguments

Defendant argues that the deliberative process and work product privileges are not absolute. He argues that he is entitled to production of the Death Penalty Evaluation Form and prosecution memorandum pursuant to personal rights created by the Sixth Amendment, the Brady Doctrine, and the DOJ guidelines. These rights, defendant argues, create an exception to the evidentiary privileges, and require production of these documents.

### 1. Sixth Amendment Right to Counsel

■ Defendant argues that, without the Death Penalty Evaluation Form and prosecution memorandum, his counsel cannot effectively advocate on his behalf in persuading the government not to seek the death penalty.

Pursuant to the Sixth Amendment and Supreme Court jurisprudence, a criminal defendant is entitled to the effective assistance of counsel at every critical stage in the proceedings. *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Lopez v. Thompson,* 202 F.3d 1110, 1116 (9th Cir.2000). A critical stage is one in which "potential substantial prejudice to the defendant's rights inheres in the ... confrontation and the ability of counsel to help avoid that prejudice." *Coleman v. Alabama,* 399 U.S. 1, 9, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) *quoting U.S. v. Wade,* 388 U.S. 218, 227, 87 S.Ct. 1926, 18

L.Ed.2d 1149 (1967) (internal quotations omitted).

Thus, the Court must determine if the process through which the government decides whether to seek the death penalty, referred to herein as the death penalty authorization process, is a critical stage in the proceedings, and, if so, whether defendant was denied the effective assistance of counsel throughout this process by the government's refusal to produce the Death Penalty Evaluation Form and prosecution memorandum.

Two of the three district courts to have considered this question have found that the death penalty authorization process is not a critical stage for Sixth Amendment purposes. *See U.S. v. Boyd,* 931 F.Supp. 968 (D.R.I.1996)(noting the discretionary nature of defense participation in the death penalty authorization process and that the ultimate decision to seek the death penalty lies with the Attorney General); *U.S. v. Gomez,* 62 F.Supp.2d 402 (D.P.R.1999)(noting the authorization process would not affect the fairness of defendant's trial and that the process is not a judicially reviewable procedure, which distinguishes it from all 'critical' stages in pre- and post-trial situations); *but see U.S. v. Pena–Gonzalez,* 62 F.Supp.2d 358, 363 (D.P.R.1999) (holding that a capital punishment authorization hearing is a critical stage because, "the substantial rights of a criminal accused may be affected").

The Supreme Court has described a 'critical' stage in criminal proceedings as a stage which affects the defendant's right to a fair trial. *U.S. v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In *Wade,* the Court found that the Sixth Amendment's right to counsel applied at "pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality," and "where counsel's absence might derogate from the accused's right to a fair trial." *Id.* at 224, 226, 87 S.Ct. 1926. Thus, a defendant is entitled to the assistance of counsel at every proceeding, "where substantial rights of a criminal accused may be affected." *Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). The Supreme Court has also focused on whether a defendant could benefit from the expertise of counsel at the proceeding to determine if it is a critical stage. *U.S. v. Ash,* 413 U.S. 300, 312, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

The Ninth Circuit has elaborated on the Supreme Court's holdings and noted three separate factors to be analyzed in determining whether a particular proceeding is a critical stage. *Menefield v. Borg,* 881 F.2d 696, 698–9 (9th Cir.1989); *U.S. v. Bohn,* 890 F.2d 1079, 1080–1 (9th Cir. 1989). First, a proceeding is critical if it could result in the loss of significant rights of the defendant. Second, a stage is critical where the presence of counsel could help the defendant understand the proceeding. Third, a proceeding is critical if it tests the merits of the case. *Menefield,* 881 F.2d at 698–9.

Defendant points to no authority which grants him the right to participate in the death penalty authorization process. As noted above, the FDPA and relevant case law make it clear that the government has the ultimate decision of whether to seek the death penalty in a given case. *U.S. v. McVeigh,* 944 F.Supp. 1478, 1483 (D.Col. 1996); *Nguyen,* 928 F.Supp. 1525, 1544. The USAM grants a defendant an opportunity to participate, but unequivocally recognizes that the ultimate decision lies with the Attorney General. Furthermore, the process neither reaches nor affects the merits of defendant's case. The process leads to a determination of the penalty the government will seek, but does not require a death sentence.

Even after the Attorney General authorizes the USA to seek the death penalty, the defendant may pursue all available remedies to persuade the district court to preclude a death sentence. Ultimately, the defendant may attempt to persuade a jury that mitigating factors outweigh any

aggravating factors that might warrant imposition of a death sentence. Under these circumstances, the death penalty authorization process does not affect either defendant's substantive rights or the ultimate merits of defendant's case. Following the framework laid out by the Ninth Circuit in *Menefield,* the Court finds that the death penalty authorization process is not a constitutionally critical stage: where a proceeding does not affect any of a defendant's substantial rights and does not reach the merits of the case, the proceeding is not a 'critical' stage under the Sixth Amendment.[3]

Furthermore, the death penalty authorization process is fundamentally different from other critical stages recognized by the courts. Primarily, the Court notes the informal nature of the process. The decision to seek the death penalty is a prosecutorial decision, not subject to judicial review. *McVeigh,* 944 F.Supp. at 1483. "Cases supporting the right to counsel in pre- and post-trial situations ... are all related to judicially reviewable proceedings." *Gomez,* 62 F.Supp.2d 402, 406–7.

Additionally, the hearing before the Committee is not adversarial in nature. A defendant is given the opportunity to present argument and supporting documentation why the Attorney General should not authorize the USA to seek the death penalty. The defendant is free to address any mitigating circumstances or any other arguments that he considers relevant to the Attorney General's decision. The presentation to the Committee is informational and persuasive; it is different from those pretrial and posttrial proceedings which are adversarial in nature or which may affect the outcome of a defendant's case. In this way, the death penalty authorization process, which includes a presentation before the Committee, differs from judicial proceedings that have been found to be critical stages for purposes of the Sixth Amendment, including probable cause hearings (*Britt v. McKenney,* 529 F.2d 44, 46 (1st Cir.1976)); plea withdrawal hearings (*United States v. Crowley,* 529 F.2d 1066, 1069 (3rd Cir.1976)); and preliminary hearings (*Adams v. Illinois,* 405 U.S. 278, 279, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972)).

Moreover, even if the death penalty authorization process were a critical stage, defendant was not denied the effective assistance of counsel throughout the process in this case. Defendant was represented by learned counsel throughout the entire authorization process, and counsel made written and oral presentations to the local USA and the Committee. *See Pena–Gonzalez,* 62 F.Supp.2d at 364 (finding a constitutional violation where defense counsel, due to differences with the defendant, did not participate in the authorization process). As the government notes, defense counsel were aware of the statutorily recognized mitigating factors and could effectively address those factors without reviewing the prosecution's internal work product.

### 2. *Brady v. Maryland*

■ In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Defendant argues that he is entitled to the Death Penalty Evaluation Form and prosecution memorandum pursuant to this rule.

Defendant argues that, under the DOJ guidelines, the prosecution memorandum must include a discussion of mitigating

---

**3.** It is true, as defendant notes, that the Supreme Court has recognized the importance of the sentencing stage. *See Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). However, the process through which the government determines which penalty it will seek is separate from the sentencing phase of a defendant's trial. *See Torres Gomez,* 62 F.Supp.2d at 406.

factors. This discussion will necessarily reference materials the government has collected relating to defendant's mental health and psychiatric records. These records, which defendant believes the government to possess, are exculpatory materials, and, therefore, he is entitled to the evaluation form and prosecution memorandum under *Brady*.

This argument fails to note the distinction between exculpatory material and work product related to that material. *Brady* may entitle defendant to production of the mental health and psychiatric records he refers to, however, *Brady* does not reach the prosecution's analysis of them. In its papers, the government stated that, in consideration of the patient-psychotherapist privilege, the prosecutors on this matter had walled themselves off from all mental health data government agents had collected regarding defendant, and that this data was neither considered for nor mentioned in the evaluation form or prosecution memorandum. Furthermore, the government notes that defendant has access to all of these records as they are simply his own mental health records.[4]

### 3. The DOJ Guidelines

 The DOJ guidelines provide that "[c]ounsel for the defendant shall be provided an opportunity to present to the Committee, orally or in writing, the reasons why the death penalty should not be sought." *Id.* at § 9–10.000D. Defendant argues that this provision of the DOJ Manual entitles him to the requested documents. According to defendant, his counsel cannot meaningfully argue before the Committee unless they know the arguments made by the USA. The guidelines would not grant defendant the opportunity to argue unless it intended that opportunity to be a meaningful one.

Case law is clear on this point: the guidelines, like any other provision in the

USAM, do not create any substantive rights. *See U.S. v. Shariff A. Roman*, 931 F.Supp. 960 (D.R.I.1996); *U.S. v. Ruben Feliciano*, 998 F.Supp. 166, 175–6 (D.Conn. 1998); *see also U.S. v. Montoya*, 45 F.3d 1286, 1294–5 (9th Cir.1995). Accordingly, defendant cannot rely on this internal DOJ manual to compel production of the requested documents.

### IV.

### *Conclusion*

The Court recognizes that the government's decision to seek the death penalty is one of critical importance. Given the extremity and permanence of the potential sentence, the decision changes the nature of the case, imparting each step with heightened gravity. The government's decision either prevents the possibility of a death sentence or begins the process toward its imposition. As such, the authorization process is undeniably of critical importance to defendant. Still, this process does not affect any of defendant's substantive rights; the decision whether or not to seek a death sentence lies solely with the prosecution.

Defendant's Motion to Compel Production of the "Death Penalty Evaluation Form" and Prosecution Memorandum is **DENIED.** These materials are protected by the deliberative process privilege and the work product privilege. Neither the Sixth Amendment, the Brady Doctrine, nor the DOJ guidelines create any personal rights in defendant which mandate production of the documents. As such, defendant fails to identify an exception to the evidentiary privileges, and the documents are barred from production.

**IT IS SO ORDERED.**

---

4. At the hearing on this motion, the government represented that it was prepared to produce all mental health and psychiatric records of the defendant in its possession. The government subsequently represented to the Court that it had produced all such records to defendant.