UNITED STATES of America

v.

Cuong Gia LE

No. CRIM. 03–048–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 1, 2004.

James Trump, Assistant United States Attorney, United States Attorney's Office, Alexandria, VA, for Plaintiff.

Frank Salvato, Alexandria, VA, James Goodman Connell, III, Devine & Connell PLC, Fairfax, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Defendant Cuong Gia, one of seven defendants in this multi-count RICO[1] indictment, is the only one of the defendants who may be subject to capital punishment if convicted of murder in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(1). When the Department of Justice ("DOJ") initiated the internal administrative process to determine whether the government would seek the death penalty against Le, his counsel promptly sought disclosure from the government of all exculpatory material, arguing that the government's *Brady–Giglio* obligations were applicable to this administrative process. This argument was rejected in a bench ruling and this memorandum opinion elucidates the reasons stated from the bench.

### I.

Defendant Cuong Gia Le stands charged with numerous racketeering-related and firearms offenses, including two counts of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1) and two counts of murder in the course of a firearms offense in violation of 18 U.S.C. § 924(j). These charges relate to a shooting at the Majestic Restaurant in Falls Church, Virginia on May 13, 2001, which resulted in the death of two individuals. The government has yet to determine whether it will seek the death penalty against Le in this case.

The federal government's decision to seek the death penalty in any particular case is made by way of a detailed internal authorization process set forth in the United States Attorneys' Manual issued by the DOJ. Department of Justice, *United States Attorneys' Manual* [hereinafter U.S.A.M.] § 9–10.010 *et seq.* Either at the time an indictment charging a defendant with a capital offense is filed or before a United States Attorney's Office decides to request approval to seek the death penalty, whichever comes first, the U.S. Attorney handling the case "should give counsel for the defendant a reasonable opportunity to present any facts, including any mitigating factors to the [U.S.] Attorney for consideration." *Id.* at § 9–10.030. If the U.S. Attorney thereafter decides to request approval from the DOJ to seek the death penalty, a "Death Penalty Evaluation" form and a prosecution memorandum must be prepared, comprehensively setting forth (I) the theory of liability; (ii) the facts and evidence, including evidence relating to any aggravating or mitigating factors; (iii) the defendant's background and criminal history; (iv) the basis for federal prosecution; and (v) any other relevant information. *Id.* at § 9–10.040. These documents, as well as a copy of the indictment and any written material submitted by defendant's counsel in opposition to the imposition of the death penalty, are then sent to the Assistant Attorney General for the Criminal Division at the Department of Justice.[2] *Id.* A Committee appointed by the Attorney General reviews these documents and defendant's counsel is provided with "an opportunity to present to the Committee, orally or in writing, the reasons why the death penalty should not be sought." *Id.* at § 9–10.050. The Committee then considers all the information presented to it and gives the Attorney General its recommendation on the issue in writing within fifteen days of receiving all the documents. *Id.* Upon receipt of the Committee's recom-

---

1. Racketeer Influenced and Corrupt Organizations Act, codified at 18 U.S.C. § 1961 *et seq.*

2. When appropriate, other significant documents, such as confessions, key witness statements, autopsy and crime scene reports, are also sent to the DOJ with these materials. *See* U.S.A.M. § 9–10.040.

mendation, the Attorney General conducts his own review and makes the final decision whether the government should file a "Notice of Intention to Seek the Death Penalty." *Id.*

This internal authorization process "is designed to promote consistency and fairness." *Id.* at § 9–10.080. Thus, in determining whether or not to seek the death penalty, the U.S. Attorney, the Attorney General's Committee and the Attorney General "must determine whether the statutory aggravating factors applicable to the offense[,] and any non-statutory aggravating factors[,] sufficiently outweigh the mitigating factors applicable to the offense to justify a sentence of death, or, in the absence of mitigating factors; whether the aggravating factors themselves are sufficient to justify a sentence of death." *Id.* In recognition of the fact that "there may be little or no evidence of mitigating factors available for consideration at the time of this determination, any mitigating factor reasonably raised by the evidence should be considered in the light most favorable to the defendant." *Id.*

**II.**

■ Defendant argues that *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny[3] compel the government to produce immediately any exculpatory evidence materially related to the factors considered during the course of the DOJ's internal death penalty authorization process, so that defendant might use this information to present to the Committee, orally or in writing, the reasons why the death penalty should not be sought. While such evidence is un-

doubtedly important to defendant, *Brady* does not compel its disclosure for purposes of this internal authorization process.

■ In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. While the evidence defendant seeks is surely material to his potential punishment, underpinning the central holding of *Brady* is the principle of "avoidance of an unfair *trial*." *Id.* (emphasis added). More recently, in *United States v. Ruiz*, the Supreme Court reiterated that a defendant's right to receive from prosecutors exculpatory material is "a right that the Constitution provides as part of its basic 'fair trial' guarantee." 536 U.S. 622, 628, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002). Thus, in *Ruiz*, the Supreme Court found that the Constitution does not require pre-guilty plea disclosure of impeachment information because "[w]hen a defendant pleads guilty[,] he ... forgoes not only a fair trial, but also other accompanying constitutional guarantees." *Id.* at 628–29, 122 S.Ct. 2450. Put simply, by entering a guilty plea, the defendant in *Ruiz* relinquished not only her right to a fair trial by jury, but also those rights inextricably connected to a fair trial, including her *Brady* right to exculpatory evidence. It is therefore clear that a defendant's *Brady* rights do not exist in the abstract, but rather find expression in connection with a defendant's right to a fair trial. As a result, *Brady* and its progeny do not create a "general constitutional

---

**3.** *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (explicitly extending *Brady* principle to Fifth Amendment's due process clause and holding that a federal prosecutor has a constitutional duty to volunteer exculpatory matter to the defense, even in the absence of a specific request for *Brady*

material); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (evidence tending to impeach a government witness must be disclosed to a defendant if known to the government); *United States v. Levenite*, 277 F.3d 454, 462–64 (4th Cir.2002) (applying *Brady* and *Giglio* ).

right to discovery in a criminal case," *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), and "[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." *United States v. Smith Grading & Paving, Inc.,* 760 F.2d 527, 532 (4th Cir.1985), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985). Therefore, it is clear that defendant has no constitutional right to exculpatory material in connection with, or in time for, its effective use during the DOJ's internal death penalty authorization process.

This conclusion is bolstered by the fact that internal DOJ guidelines do not create any substantive or procedural rights for a defendant. *See United States v. Furrow,* 100 F.Supp.2d 1170, 1178 (C.D.Cal.2000) ("Case law is clear on this point: the guidelines, like any other provision in the [U.S. Attorneys' Manual] do not create any substantive rights."); *United States v. Feliciano,* 998 F.Supp. 166, 169 (D.Conn.1998) (United States Attorneys' Manual does not create rights); *United States v. Roman,* 931 F.Supp. 960, 963–64 (D.R.I.1996) ("The protocol articulates internal administrative procedures to be followed by DOJ personnel; the protocol does not create substantive or procedural rights."); U.S.A.M. § 1–1.100 (noting that the United States Attorneys' Manual "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal"); *see also United States v. Craveiro,* 907 F.2d 260, 264 (1st Cir.1990)

("[T]he internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party."); *United States v. Montoya,* 45 F.3d 1286, 1295 (9th Cir. 1995) ("[F]ailure to strictly comply with the United States Attorneys' Manual creates no enforceable rights."); *United States v. Busher,* 817 F.2d 1409, 1411 (9th Cir.1987).

 In summary, the disclosure obligation created by *Brady* is triggered by, and attaches to, a defendant's right to a fair trial, not to a defendant's opportunity to participate in the internal DOJ administrative process concerning whether to seek capital punishment in a particular case. Of course, it is well to remember that the DOJ authorization process is "designed to promote consistency and fairness," and hence, as a general matter, the government is well-advised to provide to defendants whatever exculpatory material it has in time for a defendant to make effective use of this material during the authorization process. It is also true, however, that in many instances the result reached here will have little practical significance because where, as here, the trial and administrative processes are proceeding simultaneously, the government's *Brady* obligations, triggered by the defendant's trial, will operate to compel the government to disclose to defendant all exculpatory material on a prompt, as discovered, basis[4] and such material will then be available for a defendant's use in the trial or administrative context.[5]

---

**4.** *See Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir.1997) (government's duty to disclose exculpatory evidence "is ongoing and extends to all stages of the judicial process") (citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)).

**5.** It is clear that "disclosure of all *Brady* material, including *Giglio* impeachment material, is governed by the same legal principle:

evidence favorable to a defendant must be disclosed 'in time for its effective use at trial.'" *United States v. Beckford,* 962 F.Supp. 780, 788 (E.D.Va.1997). When the material at issue is pure impeachment material (*i.e.,* records of conviction, plea agreements, immunity agreements and the like), production of these materials a few days in advance of trial provides a defendant with "ample opportunity for review and effective use of the im-

### III.

Accordingly, defendant's Motion for Immediate Production of Exculpatory Evidence Relevant to the DOJ Death Penalty Authorization Process must be denied.

A bench ruling denying the motion has already issued.

peaching evidence" at trial. *Id.; see also United States v. Higgs,* 713 F.2d 39, 44 (3d Cir.1983) ("[A]ppellees' right to a fair trial will be fully protected if disclosure [of impeachment evidence] is made the day that the witness testifies."). This conclusion "is based on the fact that while *Giglio* material may have considerable impeachment value, the nature of that material usually does not require substantial advance time to prepare for its effective use at trial." *Id.; see also Higgs,* 713 F.2d at 44. In addition, "disclosure of *Giglio* material in useful form also serves ... to identify the witnesses to whom the material relates," which, in turn, "necessitates that the time of disclosure take into account such factors as the risk to witnesses." *Id.* at 788–89. Unlike pure *Giglio* impeachment evidence, "exculpatory evidence may require significant pre-trial investigation in order to be useful to the defendant at trial." *Id.* at 789. As a result, such exculpatory evidence must be produced on a prompt, ongoing basis.